**Reversed and Rendered and Opinion filed May 16, 2019.**



In The

# Fourteenth Court of Appeals

---

## NO. 14-17-00791-CV

---

### EQUISTAR CHEMICALS, LP, Appellant

### V.

### CLYDEUNION DB, LIMITED, Appellee

---

**On Appeal from the 190th District Court
Harris County, Texas
Trial Court Cause No. 2014-71897**

---

## O P I N I O N

A dispute arose between Equistar Chemicals, LP and ClydeUnion DB, Limited after Equistar purchased some pumps from ClydeUnion, and the pumps did not function well and became damaged. Equistar sued ClydeUnion for breaches of warranties, among other claims, and ClydeUnion sued Equistar for breach of contract because Equistar did not pay the full price for the pumps.

A jury found that ClydeUnion breached an express warranty, and Equistar breached the contract. But the jury awarded Equistar only a fraction of the damages that Equistar had requested, and the jury found that Equistar had not given ClydeUnion "a reasonable opportunity to cure the breaches of warranties." Based on the jury's findings, or possibly the trial court's application of the offer-of-settlement statute and rule concerning the recovery of litigation costs, the trial court signed a judgment that Equistar take nothing and ClydeUnion recover damages on its breach of contract claim.

Equistar appeals, contending that the trial court erred by (1) admitting, and rendering judgment on, unreliable and conclusory expert testimony; (2) excluding evidence of a letter written by ClydeUnion's attorney; (3) not disregarding the jury's answer concerning the "opportunity to cure" question; and (4) rendering a judgment for ClydeUnion on its counterclaim after applying the offer-of-settlement statute and rule.

We overrule Equistar's first two issues and sustain the latter two issues. Accordingly, we reverse the trial court's judgment and render a judgment that both parties take nothing.

## I. BACKGROUND

Equistar had been using some pumps to help transport ethane from one location to another, but the pumps were unreliable. So, Equistar ordered two specially designed pumps from ClydeUnion with the expectation that Equistar would be able to use the pumps to transport an increased capacity of ethane. Equistar anticipated that one pump would be operated at a time while the second pump served as a spare.

2

When ClydeUnion delivered the first pump, Equistar tried to operate it in December 2012. Part of the pump failed, and it had to be shut down. During the initial startup, the pump displayed subsynchronous vibrations. "Subsynchronous vibrations" means that there is a "whirl" in a pump, and "something is beating itself up" inside the pump. The pump was started again in early January 2013, but it had to be shut down after a few hours because the pump's bearings became too hot. The pump also displayed subsynchronous vibrations.

Equistar started the pump again in late January but had to shut it down the following day. Again, the pump had high temperatures and subsynchronous vibrations. This time, the vibrations reached 5.5 mils, which was above the allowable maximum vibration of 1.67 mils according to the American Petroleum Standards. ClydeUnion told Equistar that the pumps were satisfactory and could be run with the vibrations. But the vibrations remained a major concern for Equistar. Equistar insisted on additional rotordynamic analysis, which ClydeUnion said was unnecessary.

In March 2013, Equistar hired a General Electric company, Bently Nevada, to collect more detailed vibration data from the pump. The data showed "a large amount of subsynchronous vibration" as high as 5.6 mils with "steady state values near 2.6 mils." At trial, ClydeUnion presented evidence that Equistar did not provide the Bently Nevada data to ClydeUnion until after litigation began.

Equistar continued to run the pump until the second ClydeUnion pump arrived. The second pump was started in April and had a failure with the oil cooler within about forty-five minutes. The second pump also experienced subsynchronous vibrations as high as 6.2 mils.

Equistar restarted the first pump again in April and ran it through May or June. There were still issues, however, with high temperatures and vibrations and

seals leaking oil. The vibration levels kept climbing, and Equistar and ClydeUnion agreed to shut down the pumps when the vibrations reached 4 mils. A ClydeUnion engineer testified that they "all felt massively disappointed at this point" and knew that the pump "had to come out." ClydeUnion recommended that the pump be taken out of service.

In June 2013, Equistar sent the second pump to another company, HydroTex, to be opened and evaluated. They discovered that the second pump had a cracked shaft and other damage inside. Based on this information, Equistar also shut down the first pump and sent it for evaluation. The first pump's shaft was also cracked. The pumps could not be safely operated with cracked shafts.

Equistar began working on modifications to Equistar's old pumps for more reliable ethane transportation. By November 2013, Equistar was able to use the old pumps to transport an amount of ethane equal to Equistar's expected capacity from the ClydeUnion pumps. After Equistar's need to transport significant quantities of ethane ceased in September 2014, Equistar got a bid from HydroTex to repair and modify the two ClydeUnion pumps with delivery to take place in eight to ten weeks.

Equistar sued ClydeUnion for breach of warranty, and ClydeUnion countersued for breach of contract because Equistar failed to pay the full price for the pumps. The jury found that Equistar notified ClydeUnion of breaches of warranties within a reasonable time after Equistar discovered or should have discovered the breaches, but Equistar did not "give ClydeUnion a reasonable opportunity to cure the breaches of warranties." The jury awarded Equistar $391,694 in damages on the breach of warranty claim. The jury also found that Equistar failed to comply with the agreement to pay the full price for the pumps, and the jury awarded ClydeUnion $150,781.06 for the breach of contract claim.

After considering the parties' post-verdict motions, the trial court rendered a judgment for ClydeUnion in the amount of $150,781.06. Equistar appeals.

## II.  EXPERT TESTIMONY

In its first issue, Equistar contends that the trial court erred by "admitting, and rendering judgment on, unreliable and conclusory expert testimony that artificially limited the magnitude of Equistar's lost profits."[1] Equistar complains about ClydeUnion's expert on damages, David Townsend, basing his opinion about lost profits damages on two assumptions: (1) the pumps should have been taken out of service in March 2013; and (2) the pumps could have been repaired in ten weeks. Based on these assumptions, Townsend opined that Equistar's lost profits damages should have been measured based on a shorter time period compared to the time period used by Equistar's expert. Using the same methodology for calculating damages as Equistar's expert, Townsend opined that Equistar's lost profits damages for the shorter time period were about $37,500—must less than Equistar's proposed damages of about $5.1 million. The jury awarded Equistar an amount of lost profits damages consistent with Townsend's opinion. And, consistent with ClydeUnion's theory that the pumps could have been repaired before Equistar modified its old pumps for more reliable ethane transport, the jury did not award Equistar any damages for the modifications.

### A.  Legal Principles

To be admissible, an expert's opinion testimony must have a reliable foundation. *Ford Motor Co. v. Ledesma*, 242 S.W.3d 32, 38 (Tex. 2007). We

---

[1] The issue appears multifarious. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 817 (Tex. 2009) (noting distinction between a challenge to the reliability of an expert's testimony and an argument that testimony is conclusory). But we address it to the extent we can determine the alleged errors. *See Garden Ridge, L.P. v. Clear Lake Center, L.P.*, 504 S.W.3d 428, 444 (Tex. App.—Houston [14th Dist.] 2016, no pet.).

review a trial court's ruling on the admissibility of evidence, including a ruling on the reliability of expert testimony, for an abuse of discretion. *Gharda USA, Inc. v. Control Sols., Inc.*, 464 S.W.3d 338, 347 (Tex. 2015). A trial court has extensive discretion in evidentiary rulings, and we will uphold decisions within the zone of reasonable disagreement. *Diamond Offshore Servs., Ltd. v. Williams*, 542 S.W.3d 539, 545 (Tex. 2018).

Expert testimony is not reliable if there is too great an analytical gap between the data on which the expert relies and the opinion offered. *Gharda*, 464 S.W.3d at 349. "Whether an analytical gap exists is largely determined by comparing the facts the expert relied on, the facts in the record, and the expert's ultimate opinion." *Id.* An analytical gap exists if the expert's opinion is based on assumed facts that vary materially from the facts in the record. *Id.*

Furthermore, if an expert's opinion is conclusory, the testimony is incompetent and cannot support a judgment. *See City of San Antonio v. Pollock*, 284 S.W.3d 809, 816 (Tex. 2009). To be competent evidence, an expert's opinion must have a demonstrable and reasoned basis on which to evaluate the opinion. *Rogers v. Zanetti*, 518 S.W.3d 394, 405 (Tex. 2017). "When an expert's opinion is based on assumed facts that vary materially from the actual, undisputed facts, the opinion is without probative value and cannot support a verdict or judgment." *Id.* (quoting *Burroughs Wellcome Co. v. Crye*, 907 S.W.2d 497, 499 (Tex. 1995)).

## B.  Waiver

Equistar contends that it objected to Townsend's proposed opinions regarding when the pumps should have been taken out of service and the amount of time it would take to make repairs. In its reply brief, Equistar acknowledges that the trial court ruled on Equistar's objection to the first opinion (when the pumps should have been taken out of service) but, as to the second opinion (the time it

would take to make repairs), the trial court instead "made a questionable timeliness ruling." Indeed, the trial court ruled that Equistar did not timely file its "motion to strike certain opinions" of Townsend, but the trial court indicated that the "previous stuff that I've ruled on with him, I will let that stand." On appeal, Equistar does not challenge the timeliness basis for the trial court's ruling. Equistar contends that "the first objection is preserved as both a reliability complaint and a challenge to conclusory testimony," and the "second objection is preserved as a challenge to conclusory testimony."

A party may complain on appeal that conclusory opinions are legally insufficient evidence to support a judgment even if the party did not object to the admission of the testimony. *Pollock*, 284 S.W.3d at 816–17. But, to preserve a complaint that an expert's testimony is unreliable, a party must object to the testimony. *Guadalupe-Blanco River Auth. v. Kraft*, 77 S.W.3d 805, 807 (Tex. 2002); *see also* Tex. R. Evid. 103(a)(1). Generally, if an appellant fails to challenge all possible grounds for a trial court's ruling, we must accept the validity of the unchallenged ground and affirm the adverse ruling. *St. John Missionary Baptist Church v. Flakes*, 547 S.W.3d 311, 314 (Tex. App.—Dallas 2018, pet. pending); *see, e.g.*, *Oliphant Fin. L.L.C. v. Hill*, 310 S.W.3d 76, 77–78 (Tex. App.—El Paso 2010, pet. denied); *Britton v. Tex. Dep't of Crim. Justice*, 95 S.W.3d 676, 680–81 (Tex. App.—Houston [1st Dist.] 2002, no pet.); *cf, e.g.*, *Katy Springs & Mfg., Inc. v. Favalora*, 476 S.W.3d 579, 607 (Tex. App.—Houston [14th Dist.] 2015, pet. denied) ("If a party does not challenge all possible grounds for a trial court's ruling that sustains an objection to evidence, then the party waives any error for appellate review.").

Because Equistar does not challenge on appeal a ground for the trial court's ruling to admit Townsend's opinion regarding the time it would take to make repairs, we affirm the admission of that portion of Townsend's opinion.[2]

## C.    Reliability and Conclusory Challenge: When to Remove Pumps

The trial court admitted testimony from one of ClydeUnion's experts, Peter Thompson, that the Bently Nevada report provided to Equistar in March 2013 showed that "the pumps shouldn't run any further." Had Thompson seen the Bently Nevada report in March 2013, he "would have said that this pump now requires internal examination. In other words, stop it." Thompson testified that had the damage to the pump been discovered, the pump could have been repaired.

Townsend, a damages expert, may use other experts' opinions or data to formulate opinions based on his own expertise. *See Gharda*, 464 S.W.3d at 352 (noting that experts may rely on other experts' opinions and data so long as the other experts' opinions and data is also reliable). To formulate Townsend's damages opinion, Townsend could have relied on Thompson's conclusion that the pumps should have been stopped and examined in March 2013 immediately following Equistar's receipt of the Bently Nevada report. Equistar does not challenge Thompson's opinions based on the Bently Nevada report, nor does Equistar challenge any experts' reliance on the data in the Bently Nevada report. Thus, the first assumption upon which Townsend relied—that the pumps should have been stopped and examined in March 2013—is not a fact that varies materially from the facts in the record. Townsend's reliance on this assumption

---

[2] Because we affirm the trial court's ruling on this basis, we do not address whether Equistar preserved error in the trial court. We note, however, that Equistar's written motion and arguments at the hearing concerned the reliability of an opinion about whether the pipes were repairable at all, not about the amount of time it would take to repair them.

when calculating lost profits damages does not render his opinion on damages unreliable or conclusory.

Equistar also challenges Townsend's opinion because Townsend broadly referred to "the pumps" rather than just the first pump, since the second pump had not yet been started or analyzed by March 2013. Equistar attempts to undermine Townsend's opinion by pointing to evidence that ClydeUnion encouraged Equistar to keep running the second pump after March 2013.

Townsend's lost profits damages opinion was based on Equistar's inability to pump the expected capacity of ethane in April and May 2013. From this record, it appears Townsend's opinion about damages assumed that neither pump was sufficient to pump the expected capacity of ethane in April and May 2013. Townsend used the same underlying data and methodology for calculating damages as did Equistar for the months of April and May 2013. Thus, even if Townsend relied on an erroneous assumption that both "pumps," rather than just the first pump, should have been removed in March 2013, Townsend's ultimate opinion about the measure of lost profits damages was not affected. If the second pump had been fully operational in April and May 2013, Equistar would have suffered no lost profits damages. Accordingly, Townsend's purported reliance on an assumption that the "pumps" would be out of service in April and May 2013 does not render his damages calculation unreliable or conclusory.

## D.    Conclusory Challenge: Time for Repairs

Townsend based the second assumption upon which he relied—that the pumps could have been repaired in ten weeks—on a bid HydroTex gave to Equistar. Equistar contends that the ten-week estimate for repairs renders Townsend's damages opinion unreliable and conclusory because the HydroTex proposal was for a "major modification" of the pumps and would turn the pumps

into different kinds of pumps that could pump materials other than ethane. The HydroTex proposal would make the pumps transport fewer gallons per minute. And, Equistar contends that the HydroTex timetable necessarily did not include any diagnostic analysis that took place before Equistar requested the bid from HydroTex.

Equistar's arguments, however, require a court to "evaluate the underlying methodology, technique, or foundational data used by the expert." *See Pollock*, 284 S.W.3d at 817. These complaints are directed at the reliability of Townsend's opinion, not whether it is conclusory on its face. *See id.*

Furthermore, the record contains other evidence to support Townsend's use of the HydroTex time frame. Another ClydeUnion expert, Kenneth Fischer, testified that the problems with the pumps could have been "quickly and effectively addressed" by replacing the pumps' damaged shafts and utilizing a different type of bushings (Graphalloy). Thompson similarly testified that the fundamental repair to be made to the pumps would be to change out the bushings for Graphalloy with increased clearance and grooving. Two of the many items HydroTex proposed to replace during its ten-week time frame included new shafts and Graphalloy bushings. Thus, although the HydroTex time frame of up to ten weeks included a "remanufacture" of the ClydeUnion pumps, the modifications included replacing the shafts and bushings using the same material suggested by ClydeUnion's experts. Townsend explained that the ten-week time frame was a "conservative" estimate of the time necessary for making repairs—specifically, replacing the shafts and bushings with Graphalloy.

Townsend's opinion about the amount of lost profits, based on an estimated repair time of ten weeks, does not vary materially from undisputed facts in the

record. Townsend's ultimate opinion is not "speculative or conclusory on its face." *See id.*

Equistar's first issue is overruled.

### III. EXCLUSION OF EVIDENCE

In its second issue, Equistar contends that the trial court erred by excluding "evidence that was essential to prove both (a) that Equistar gave ClydeUnion an opportunity to cure, and (b) the magnitude of Equistar's lost profits." We assume without deciding that the trial court erred by excluding the evidence. However, the alleged error was not harmful.

### A. The Evidence and Procedural Background

Equistar complains about the trial court's exclusion of a letter sent by ClydeUnion's attorney in October 2013 wherein ClydeUnion offered to perform warranty work on the pumps. In the letter, ClydeUnion wrote that in exchange for performing the work, CyldeUnion would require Equistar to release ClydeUnion from all damage claims. Further, ClydeUnion estimated the time necessary for repairs to be about six months.

At trial, ClydeUnion objected to the letter based on Rules 403 and 408 of the Texas Rules of Evidence. *See* Tex. R. Evid. 403; Tex. R. Evid. 408. ClydeUnion argued that the letter was a settlement communication subject to exclusion under Rule 408. Equistar proposed specific redactions to the letter to omit a reference to settlement, although Equistar did not redact ClydeUnion's demand that Equistar release its damage claims.

### B. Legal Principles

"The exclusion of evidence is reversible error if the complaining party shows that the trial court committed error that probably caused the rendition of an

11

improper judgment." *Waffle House, Inc. v. Williams*, 313 S.W.3d 796, 812 (Tex. 2010); *see also* Tex. R. App. P. 44.1(a). In making this determination, we review the entire record. *State v. Cent. Expressway Sign Assocs.*, 302 S.W.3d 866, 870 (Tex. 2009). The role that the excluded evidence played in the context of the trial is important. *Id.* If the excluded evidence was crucial to a key issue, the error is likely harmful. *Id.* But if the evidence was cumulative or the rest of the evidence at trial was so one-sided that the error likely made no difference in the judgment, then the error is likely harmless. *Id.* "Generally, exclusion of evidence is not reversible error unless the complaining party demonstrates that the whole case turns on the particular evidence excluded." *Garden Ridge, L.P. v. Clear Lake Center, L.P.*, 504 S.W.3d 428, 441 (Tex. App.—Houston [14th Dist.] 2016, no pet.) (quotation omitted); *see also City of Brownsville v. Alvarado*, 897 S.W.2d 750, 753–54 (Tex. 1995) ("A successful challenge to evidentiary rulings usually requires the complaining party to show that the judgment turns on the particular evidence excluded or admitted.").

## C.    No Harm

Equistar contends that ClydeUnion's statements in the letter "directly contradicted its trial themes on issues that were central to the dispute—including opportunity to cure, the time necessary for repairs, and undue delay."

### 1.    *Time Necessary for Repairs*

Immediately before Equistar cross-examined Townsend, the trial court ruled that Equistar could question Townsend about ClydeUnion's representation that the repairs would take six months. Townsend later testified that he was aware ClydeUnion represented to Equistar that it would take approximately six months to implement the repairs that ClydeUnion thought should be made. Townsend dismissed the estimate as "a lawyer number" that did not involve engineers.

Equistar contends that the letter was "qualitatively different than other types of evidence," and the letter provided "powerful substantiation" of Equistar's contentions in a case where otherwise Equistar had "only [its] word," citing *Diamond Offshore Services Ltd. v. Williams*, 542 S.W.3d 539, 548 (Tex. 2018), and *Stergiou v. General Metal Fabricating Corp.*, 123 S.W.3d 1, 6 (Tex. App.— Houston [1st Dist.] 2003, pet. denied).

*Diamond Offshore* involved a video of a personal injury claimant engaging in physical activities. 542 S.W.3d at 542. The Supreme Court of Texas reasoned that the video was not cumulative of the claimant's testimony acknowledging that he could do all of the activities depicted in the video. *Id.* at 548–49. The court's opinion was heavily influenced by the fact that the excluded evidence was a video. *See id.* at 542, 548–49.

*Stergiou* involved a dispute over whether the defendant owned stock in a company. *See* 123 S.W.3d at 3. The First Court of Appeals reasoned that letters of intent showing the plaintiff's recognition of the defendant's ownership of the stock was not cumulative of the plaintiff's testimony. *See id.* at 5–6. Because the trial court excluded the letters, the defendant "had only his word" that he owned the stock. *Id.* at 6.

Unlike in *Stergiou*, the cross-examination of Townsend provided evidence that was cumulative of the representation in the letter that repairs would take six months. The letter, although a different type of evidence compared to Townsend's testimony, was not so qualitatively different that its exclusion probably caused the rendition of an improper judgment. *See Garden Ridge*, 504 S.W.3d at 441 (no harmful error because content of e-mail was presented through witness's testimony). The trial court's judgment does not turn on the excluded evidence of the letter's recitation of a six-month estimate for repairs.

13

### 2. *Undue Delay*

Equistar contends that the letter would have "refuted the accusation of 'undue delay'" made by ClydeUnion because ClydeUnion waited four months to respond to Equistar's demand for damages and for cure. The excluded letter was sent in October 2013 in response to Equistar's earlier letters in May and July 2013, which were admitted as exhibits. But Equistar acknowledges that ClydeUnion's theory of undue delay was that Equistar failed to try to fix the pumps or share with ClydeUnion the Bently Nevada data in March 2013. Equistar contends on appeal that the lost profits damages awarded by the jury were consistent with Townsend's testimony that damages should have been limited to April and May 2013. But nothing in the letter rebuts ClydeUnion's allegations that Equistar should have shared the Bently Nevada data in March. Thus, the trial court's judgment does not turn on the excluded evidence in the letter regarding ClydeUnion's "accusation of undue delay."

### 3. *Opportunity to Cure*

Equistar contends that the letter showed that ClydeUnion had been given an opportunity to cure the flaws in its pumps, but that ClydeUnion attempted to "leverage that opportunity into a release of all claims." Equistar suggests there is harm because the jury found that Equistar did not give ClydeUnion an opportunity to cure, and ClydeUnion focused on this allegation in its closing arguments.

Again, the applicable time period related to the jury's finding of lost profits damages was purportedly April and May 2013, not the delay between Equistar's letters and ClydeUnion's offer to cure in October 2013. Equistar was not prohibited from adducing evidence that ClydeUnion had been telling Equistar that the pumps were fine to operate before the summer of 2013 and were not defective. The jury heard evidence that ClydeUnion had been involved with testing of the

pumps and was aware of subsynchronous vibrations soon after the pumps were installed. The jury saw Equistar's July 2013 letter to ClydeUnion, wherein Equistar asked ClydeUnion for an explanation of all repairs necessary to make the pumps operable. Thus, any suggestion from the October 2013 letter that ClydeUnion had been given an opportunity to cure was cumulative of other evidence.

Furthermore, as explained in greater detail later in this opinion, we agree with Equistar that the trial court erred by failing to disregard the jury's answer to the opportunity-to-cure question because it was immaterial and cannot support the trial court's judgment. Thus, exclusion of evidence related to the opportunity-to-cure issue did not probably cause the rendition of an improper judgment. *See Elliott v. Elliott*, 21 S.W.3d 913, 922 (Tex. App.—Fort Worth 2000, pet. denied) ("[W]here evidence is immaterial to any issue before the court, erroneous exclusion of that evidence is simply not harmful."); *Altum v. Booth*, 399 S.W.2d 836, 840 (Tex. App.—Austin 1966, no writ) ("It would not be reversible error to exclude evidence relating to an immaterial issue.")

Equistar's second issue is overruled.

## IV. DISREGARDING JURY QUESTION

In its third issue, Equistar contends the trial court's judgment cannot be affirmed based on the jury's answer to the opportunity-to-cure question. Equistar contends the trial court should have disregarded the jury's answer. We agree with Equistar.

## A. Background

Equistar pursued claims for breach of warranty at trial. Over Equistar's objection, the trial court submitted Jury Question No. 8:

15

Did Equistar give ClydeUnion a reasonable opportunity to cure the breaches of warranties, if any?

Answer "Yes" or "No."

The jury answered, "No." The jury also answered, "Yes," to Jury Question No. 7: "Did Equistar notify ClydeUnion of the breaches of warranties, if any, within a reasonable time after Equistar discovered or should have discovered the breaches?"

In responding to ClydeUnion's motion for entry of judgment and in Equistar's own motion for judgment notwithstanding the verdict, Equistar asked the trial court to disregard the jury's answer to Jury Question No. 8 because the answer was immaterial to the judgment. The trial court signed an order denying Equistar's motion, and the court signed a final judgment ordering that (1) Equistar take nothing on its claims against ClydeUnion, and (2) ClydeUnion recover against Equistar $150,781.06 in damages plus costs and interest.

## B.  Arguments on Appeal

Equistar contends that the opportunity-to-cure question was immaterial and should have been disregarded. ClydeUnion contends that the jury's answer to the question was material because Equistar's failure to provide ClydeUnion a reasonable opportunity to cure bars Equistar's recovery of damages for breach of warranty. ClydeUnion posits two sources for the alleged requirement of opportunity to cure: (1) the Uniform Commercial Code (UCC), specifically Sections 2.607 and 2.608, and (2) the contract between the parties.

## C.  Legal Principles for Disregarding Jury Findings

A trial court may disregard a jury finding if it is unsupported by the evidence or if the issue is immaterial. *Spencer v. Eagle Star Ins. Co. of Am.*, 876 S.W.2d 154, 157 (Tex. 1994). A question is immaterial if it should not have been

16

submitted, if it has been rendered immaterial by other findings, *id.*, or if the jury's answer cannot alter the effect of the verdict, *BP Am. Prod. Co. v. Red Deer Res., LLC*, 526 S.W.3d 389, 402 (Tex. 2017).

## D. No Right to Cure Under the UCC

Statutory construction is a question of law and reviewed de novo. *Sw. Royalties, Inc. v. Hegar*, 500 S.W.3d 400, 404 (Tex. 2016). Our primary objective is to give effect to the Legislature's intent, which we ascertain from the plain meaning of the words used in the statute if possible. *Id.*

When reviewing a uniform act such as the UCC, we must construe the act to effect its general purpose and to make uniform the law of those states that enact it. *MBank El Paso, N.A. v. Sanchez*, 836 S.W.2d 151, 154 (Tex. 1992) (citing Tex. Gov't Code § 311.028). The UCC should be construed to promote uniformity with other jurisdictions. *1/2 Price Checks Cashed v. United Auto. Ins. Co.*, 344 S.W.3d 378, 391 & n.29 (Tex. 2011) (considering cases from other jurisdictions). Although the Official UCC Comments following the code provisions are not law, they are persuasive authority concerning interpretation of the statutory language. *Fetter v. Wells Fargo Bank, Tex., N.A.*, 110 S.W.3d 683, 687 (Tex. App.—Houston [14th Dist.] 2003, no pet.), *quoted with approval in In re City of Dickinson*, 568 S.W.3d 642, 647 (Tex. 2019).

A buyer's acceptance or rejection of non-conforming goods determines the remedies available to the buyer. *Toshiba Mach. Co., Am. v. SPM Flow Control, Inc.*, 180 S.W.3d 761, 771 (Tex. App.—Fort Worth 2005, pet. granted, judgm't vacated w.r.m.) (op. on rehearing). If a buyer rejects goods or revokes acceptance, the buyer may recover breach of contract remedies. *See Selectouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.); *see also* Tex. Bus. & Com. Code § 2.608(c) (providing that a buyer who revokes acceptance has

17

"the same rights and duties with regard to the goods involved as if he had rejected them"). But, if the buyer has accepted goods and not revoked acceptance, the buyer may recover damages for a breach of warranty under certain conditions. *See* Tex. Bus. & Com. Code § 2.714; *Selectouch*, 111 S.W.3d at 834.

If a buyer rejects goods because of non-conformity and the time for performance has not yet expired, "the seller may seasonably notify the buyer of his intention to cure and may then within the contract time make a conforming delivery." Tex. Bus. & Com. Code § 2.508(a). Similarly, if a buyer rejects goods because of non-conformity, but the seller had reasonable grounds to believe the tender would be acceptable, the seller may have a further reasonable time to substitute a conforming tender if the seller seasonably notifies the buyer. *Id.* § 2.508(b). These provisions, applicable when a buyer **rejects** goods, are commonly understood as the seller's right to cure. *See, e.g.*, 18 *Williston on Contracts* § 52:24 (4th ed.), Westlaw (database updated Nov. 2018); *see also Gappelberg v. Landrum*, 666 S.W.2d 88, 89 (Tex. 1984) ("The right of the seller to cure by repair or replacement clearly exists in instances of rejection.").

If a buyer accepts goods without knowledge of the goods' non-conformity and then revokes acceptance, however, the seller has no right to cure by repair or replacement. *See Gappelberg*, 666 S.W.2d at 90–91; *see also* Tex. Bus. & Com. Code § 2.608(a)(2). In *Gappelberg*, the Supreme Court of Texas followed out-of-state authorities, which had reasoned that "the right of seller to cure exists only in instances of buyer rejection." 666 S.W.2d at 90 (citing, among others, *Bonebrake v. Cox*, 499 F.2d 951 (8th Cir. 1974), and *Linscott v. Smith*, 587 P.2d 1271 (Kan. App. 1978)).

When, as here, the buyer accepts goods and does not revoke acceptance, then the buyer may recover damages for a breach of warranty if the buyer has

provided notice of the breach under Section 2.607. *See* Tex. Bus. & Com. Code § 2.714. Under Section 2.607, "the buyer must within a reasonable time after he discovers or should have discovered any breach notify the seller of breach or be barred from any remedy." *Id.* § 2.607(c)(1). The official comments to the statute explain, "The notification which saves the buyer's rights under this Article need only be such as informs the seller that the transaction is claimed to involve a breach, and thus opens the way for normal settlement through negotiation." *Id.* cmt. 4. "Notice" means that the buyer has taken "such steps as may be reasonably required to inform the [seller] in ordinary course, whether or not the [seller] actually comes to know of it." *Id.* § 1.202(d).

ClydeUnion concedes that Equistar provided notice under Section 2.607(c)(1), just as the jury found in the answer to Jury Question No. 7. But ClydeUnion contends that Equistar had a statutory obligation to provide ClydeUnion a "reasonable opportunity to cure" the breach of warranty. One of the reasons for the statutory notice requirement in Section 2.607 is to provide the seller with an opportunity to cure with the goal of minimizing the buyer's loss and reducing the seller's liability to the buyer. *See* 1 James J. White et al., *Uniform Commercial Code* § 12:19 (6th ed.), Westlaw (database updated Nov. 2018). Many cases upon which ClydeUnion relies, such as *Hull v. South Coast Catamarans, L.P.*, appear to equate the statutory notice requirement with providing the seller an opportunity to cure. *See* 365 S.W.3d 35, 44 (Tex. App.—Houston [1st Dist.] 2011, pet. denied) ("Failure to notify the seller of the breach, thereby allowing the seller an opportunity to cure, bars recovery on the basis of breach of warranty."). Indeed, *Hull* reversed a summary judgment for the defendants after concluding that "the defendants received notice as required by section 2.607," and there were issues of

material fact "as to whether [the plaintiff] provided the defendants an opportunity to cure." *Id.*

Thus, *Hull* appears to require proof of an opportunity to cure in addition to the notice required by the statute. *See id. Hull* has been criticized for conflating notice with opportunity to cure. *See* 12 John E. Krahmer, *Texas Practice Series: Texas Methods of Practice* § 25:99 n.20 (3d ed. 2005), Westlaw (database updated Feb. 2019) ("Unfortunately, the [*Hull*] court did not clearly explain why it deemed giving the seller an opportunity to cure was relevant to the giving of notice unless the court regarded the buyer's demand for refund was tantamount to a surprise rejection under § 2.508 which does provide sellers with a limited opportunity to cure.").

The criticism of *Hull* is justified. As explained in *Williston on Contracts* regarding buyers who sue for damages after accepting non-conforming goods, although "permitting the seller to cure the non-conformity might operate to lessen or mitigate the buyer's damages, the buyer's refusal to allow the seller to cure, where the non-conformity might have been cured by the seller, does not in any way diminish the buyer's right of recovery." 18 *Williston on Contracts*, *supra*, § 52:24. The Eighth Circuit clearly stated this principal in a case relied upon by the Supreme Court of Texas in *Gappelberg*:

> While it may be true that the most important reason for requiring notice (under § 2-607) is to enable the seller to make adjustments or replacements or to suggest opportunities for cure to the end of minimizing the buyer's loss and reducing the seller's own liability to the buyer, a buyer who has accepted nonconforming goods is under no duty to accept an offer of cure by the seller. His refusal to do so raises only the question of whether he has properly mitigated his damages; it does not extinguish entirely his right to recover.

*Bonebrake*, 499 F.2d at 957 (quotation and footnote omitted), *cited in Gappelberg*, 666 S.W.2d at 90 (noting that a seller's right to cure was "limited to situations where non-conforming goods had been rejected by the buyer"); *see also Vanalt Elec. Constr. Inc., v. Selco Mfg. Corp.*, 233 Fed. App'x 105, 110 (3d Cir. 2007) (evaluating jury charge and noting that the Pennsylvania equivalent of Section 2.607 "does not, by its terms, require the buyer, having given notice, to allow the seller additional time to cure the defect"); *Great W. Press, Inc. v. Atlanta Film Converting Co.*, 479 S.E.2d 143, 145 (Ga. Ct. App. 1996) (rejecting argument, "notwithstanding the policies behind" the Georgia equivalent of Section 2.607, that seller had right to cure defective goods after buyer accepted the goods); *Berning v. Drumwright*, 832 P.2d 1138, 1143–44 (Idaho Ct. App. 1992) ("A right to cure is relevant only when a buyer has rejected goods prior to a formal acceptance; the UCC does not allow a seller the right to cure defects following a buyer's acceptance of the goods."); *Linscott*, 587 P.2d at 1273–74 ("The right to cure or substitute for nonconforming goods arises only upon the buyer's rejection of the goods. . . . [T]he buyer's acceptance precludes rejection and rejection is a prerequisite to the seller's right to cure . . . ."), *cited in Gappelberg*, 666 S.W.2d at 90.

In the context of jury instructions, two Texas Courts of Appeals have addressed the issue of whether a seller is entitled to an opportunity to cure when the buyer has accepted goods and not revoked acceptance. The courts reached opposite conclusions.

In *Boies v. Norton*, the Austin Court of Appeals held that the trial court did not err by omitting jury questions about whether the seller offered to repair the good and whether the buyer prevented the seller from repairing it. *See* 526 S.W.2d 651, 653 (Tex. App.—Austin 1975 writ ref'd n.r.e.). The court held that Section

21

2.508 concerning the right to cure was inapplicable because the buyer did not reject the good, but rather accepted the good and sued for damages. *See id.* at 652–53.

In *Miller v. Spencer*, the Dallas Court of Appeals held that "opportunity to cure" was an "essential element of this U.C.C. breach of warranty action" brought under the Deceptive Trade Practices–Consumer Protection Act (DTPA), Tex. Bus. & Com. Code §§ 17.41–17.63, and the trial court erred by failing to submit a jury question asking whether the defendant was given a reasonable opportunity to cure the defects. 732 S.W.2d 758, 760–61 (Tex. App.—Dallas 1987, no pet.). The court reasoned that a buyer "must meet this requirement of notice and opportunity to cure" to recover under the DTPA for breach of warranty. *Id.* at 761 (citing *Sw. Lincoln-Mercury, Inc. v. Ross*, 580 S.W.2d 2, 4–5 (Tex. App.—Houston [1st Dist.] 1979, no writ), and *Import Motors, Inc. v. Matthews*, 557 S.W.2d 807, 809 (Tex. App.—Austin 1977, writ ref'd n.r.e.)). We disagree with *Miller* and do not find it persuasive in light of the authorities discussed above.[3]

ClydeUnion asserts for the first time on appeal that there is "another statutory basis" for the jury question regarding opportunity to cure—Section 2.608(a)(1). The statute provides:

> (a) The buyer may revoke his acceptance of a lot or commercial unit whose non-conformity substantially impairs its value to him if he has accepted it

---

[3] *Miller*'s reliance on 1979 and older DTPA cases may have tainted the court's analysis. Before 1979, there was a partial statutory defense for breach of warranty claims brought under the DTPA if the defendant "was not given a reasonable opportunity to cure the defects or malfunctions before suit was filed." Act of May 10, 1977, 65th Leg., R.S., ch. 216, § 6, 1977 Tex. Gen. Laws 600, 604. This defense was repealed in 1979. *See* Act of May 16, 1979, 66th Leg., R.S., ch. 603, § 5, 1979 Tex. Gen. Laws 1327, 1330 (codified as amended at Tex. Bus. & Com. Code § 17.505); *see also* 27 Stephen Cochran, *Texas Practice: Consumer Rights and Remedies* § 1.24 n.18 (3d ed. 2002).

(1) on the reasonable assumption that its non-conformity would be cured and it has not been seasonably cured; or

(2) without discovery of such non-conformity if his acceptance was reasonably induced either by the difficulty of discovery before acceptance or by the seller's assurances.

. . . .

(c) A buyer who so revokes has the same rights and duties with regard to the goods involved as if he had rejected them.

Tex. Bus. & Com. Code § 2.608. ClydeUnion contends, "No Texas court has examined what rights and duties, if any, this section creates." ClydeUnion cites cases from other jurisdictions involving "reacceptance," *see Ranta Const., Inc. v. Anderson*, 190 P.3d 835, 843–44 (Colo. App. 2008), and dicta about a right to cure potentially being "inferred" from the text of Section 2.608(1)(a), *see Champion Ford Sales, Inc. v. Levine*, 433 A.2d 1218, 1222 (Md. Ct. Spec. App. 1981). White, Summers, and Hillman note that some recent cases have shown "an increased willingness to allow the seller to cure after acceptance and before allowing the buyer to exercise the right to revoke." White et al., *supra*, § 9:23. But the authors also note that "most courts held that the seller does not have the right to cure in revocation cases; these courts relied mostly on a strict reading of the text of the Code." *Id.* § 9:23 & n.2 (citing the "comprehensive analysis" in *Gappelberg*, 666 S.W.2d 88); *see also* 18 *Williston on Contracts*, *supra*, § 52:25 & n.8 (noting that "courts in the majority of jurisdictions have concluded that the seller's right to cure does not apply to situations in which the buyer revokes acceptance based on a subsequently discovered defect"; citing the "exceptionally good discussion" in *Gappelberg*, 666 S.W.2d 88).

Section 2.608 does not grant ClydeUnion a right to cure for several reasons. First, there is no dispute about whether Equistar revoked acceptance; Equistar did not revoke acceptance. Second, even if Equistar had revoked, subsection (c) refers

only to a "buyer's" rights, not the seller's. *See Gappelberg*, 666 S.W.2d at 90 ("We do not consider paragraph (c) in U.C.C. § 2.608 as having any reference to U.C.C. § 2.508. . . . U.C.C. § 2.608(c) makes absolutely no mention of seller's rights."). Third and finally, there is no evidence that Equistar knew that the pumps were defective when Equistar accepted them. *See id.* ("The only reference to cure in § 2.608 is in situations when the buyer knew of the defects at the time of acceptance of the goods.").

ClydeUnion contends that Equistar did not "'finally' accept the pumps until sometime after it demanded cure." But acceptance occurs when the buyer "does any act inconsistent with the seller's ownership." Tex. Bus. & Com. Code § 2.606(a)(3). "[I]nstallation by the buyer of heavy equipment supplied by the seller is an act inconsistent with the seller's ownership." *U.S. ex rel Fram Corp. v. Crawford*, 443 F.2d 611, 613 (5th Cir. 1971) (applying Georgia UCC). Equistar installed the pumps and used them until ClydeUnion agreed with Equistar to take the pumps out of service. Thus, Equistar accepted the pumps and never rejected them or revoked acceptance.[4]

Accordingly, there is no statutory basis for the jury's answer to Jury Question No. 8 serving as a bar to Equistar's recovery on a breach of warranty claim.

### E.    No Right to Cure Under the Contract

ClydeUnion also contends that it had a contractual right to be afforded an opportunity to cure based on Article 26 of the purchase agreement. ClydeUnion

---

[4] This was ClydeUnion's theory at trial, confirmed by closing arguments: "They accepted the pumps. I know they're complaining about them. They didn't want it. They—they could have sent them back. They could have said, 'No, we reject the goods,' but they didn't. . . . [T]hey accepted the pumps. They didn't have to. They could have sent them back on day one when the mechanical seal failed, but they didn't. They chose to keep them."

contends that Equistar's failure to comply with this provision bars Equistar's recovery of damages for breach of warranty:

> Article 26 # Quality: Seller warrants that the goods which Seller delivers will be new, of good quality, and conform to the description stated in the Contract. ***Seller agrees to promptly repair or replace any defective goods that Buyer has notified Seller about*** within earlier of eighteen (18) months following the date of delivery or twelve (12) months following the date of installation. If Seller fails to promptly repair or replace the defective goods, Seller agrees that Buyer will be entitled to repair or replace them. . . .[5]

ClydeUnion relies solely on this text, Section 2.719 of the UCC, and a law review article.

> Section 2.719 provides that, subject to certain other provisions,
>
> (1) the agreement may provide for remedies in addition to or in substitution for those provided in this chapter and may limit or alter the measure of damages recoverable under this chapter, as by limiting the buyer's remedies to return of the goods and repayment of the price or to repair and replacement of non-conforming goods or parts; and
>
> (2) resort to a remedy as provided is optional unless the remedy is expressly agreed to be exclusive, in which case it is the sole remedy.

Tex. Bus. & Com Code § 2.719(a). Further, if "circumstances cause an exclusive or limited remedy to fail of its essential purpose, remedy may be had as provided in this title," i.e., damages for breach of warranty. *Id.* § 2.719(b); *see also id.* § 2.714. The statute "creates a presumption that clauses prescribing remedies are cumulative rather than exclusive." *Id.* § 2.719, cmt. 2. "If the parties intend the term to describe the sole remedy under the contract, this must be clearly expressed." *Id.* ClydeUnion refers to a law review article for the proposition that "a buyer and seller can agree that the seller may cure a defect at any time." William

---

[5] Emphasis supplied by ClydeUnion.

Henning & William Lawrence, *A Unified Rationale for Section 2-607(3)(a) Notification*, 46 San Diego L. Rev. 573, 590 (2009).[6]

The interpretation of an unambiguous contract is a question of law that we review de novo using well-settled contract-construction principles. *URI, Inc. v. Kleberg Cty.*, 543 S.W.3d 755, 763 (Tex. 2018). We presume that parties intend what the words in their contract say, and we interpret contract language according to its plain, ordinary, and generally accepted meaning unless the contract directs otherwise. *Id.* at 763–64.

In this case, Article 26 of the contract imposes an obligation on ClydeUnion to repair or replace. It does not contain the type of language that courts have held to establish an exclusive or sole remedy provision. *See PPG Indus., Inc. v. JMB/Houston Ctrs. Partners Ltd. P'ship*, 146 S.W.3d 79, 98, 101 (Tex. 2004) (seller's warranty limited to replacement when contract provided, "Pursuant to this limited warranty, [seller] will only supply a new unit, and no labor, installation or special or consequential damages are included. . . . [Seller] makes no other warranty."); *Henderson v. Ford Motor Co.*, 547 S.W.2d 663, 665, 667–68 (Tex. App.—Amarillo 1977, no writ) (seller's warranty limited to repair or replacement when contract provided for repair or replacement and that "this warranty is expressly IN LIEU OF any other express or implied warranty, condition or guarantee with respect to the vehicle or any part thereof, including any implied WARRANTY OF MERCHANTABILITY OR FITNESS," and that "vehicle is purchased AS IS"); *Lankford v. Rogers Ford Sales*, 478 S.W.2d 248, 250–51 (Tex. App.—El Paso 1972, writ ref'd n.r.e.) (seller's warranty limited to repair or

---

[6] We note that the authors contend, contrary to ClydeUnion's argument discussed above, that "sellers do not have a statutory right to cure in the context of section 2-607(3)(a) [section 2.607(c)(1) in Texas] and a seller cannot bootstrap its way into additional cure rights through the notification responsibilities allocated to the buyer." Henning & Lawrence, *supra*, at 590 (footnote omitted).

replacement when contract provided, "The warranties herein are expressly IN LIEU OF any other express or implied warranty, including any implied WARRANTY of MERCHANTABILITY or FITNESS, and of any other obligation on the part of the Company or the Selling Dealer.").

According to the plain and ordinary language of Article 26, the remedy of repair or replacement was cumulative of other remedies provided for by the UCC because the contract does not clearly express an intent for repair or replacement to be Equistar's sole remedy. Thus, Equistar's resort to a remedy of repair or replacement was "optional." *See* Tex. Bus. & Com. Code § 2.719(a)(2). Equistar's failure to utilize an optional remedy—allowing ClydeUnion an opportunity to cure—cannot bar Equistar from recovering damages for breach of warranty.

## F.  Error

Having concluded that ClydeUnion did not have a statutory or contractual right to cure, we hold that the jury's answer to Jury Question No. 8 regarding opportunity to cure was immaterial because it should not have been submitted and cannot alter the effect of the verdict. If the trial court rendered a take nothing judgment on Equistar's claim because the court failed to disregard the jury's answer, the trial court erred.

Equistar's third issue is sustained.

## V.  LITIGATION COSTS

The parties agree that the trial court might have rendered the judgment that it did—a judgment for ClydeUnion of $150,781.06—irrespective of the "opportunity to cure" issue by awarding litigation costs under Chapter 42 of the Civil Practice and Remedies Code and Rule 167 of the Texas Rules of Appellate Procedure (the "offer of settlement" or "offer of judgment" statute and rule). The parties agree that

ClydeUnion made a settlement offer, Equistar rejected it, and the judgment to be rendered would have been significantly less favorable to Equistar than the settlement offer.[7] The parties agree, therefore, that ClydeUnion's litigation costs had to be "awarded to [ClydeUnion] in the judgment as an offset against [Equistar's] recovery from [ClydeUnion]." *See* Tex. Civ. Prac. & Rem. Code § 42.004(g). The parties acknowledge that "litigation costs that may be awarded under this chapter to any party may not be greater than the total amount the claimant recovers or would recover before . . . subtracting as an offset an award of litigation costs under this chapter in favor of the defendant." *Id.* § 42.004(d). And the parties agree that ClydeUnion's litigation costs far exceeded the amount of damages that the jury awarded to Equistar.

The parties dispute, however, the method for calculating the final judgment when, as here, the fact finder has awarded damages to the defendant on a counterclaim. Equistar contends that ClydeUnion's damages should be offset against Equistar's damages before offsetting the award of litigation costs to ClydeUnion, resulting in a take-nothing judgment for ClydeUnion. ClydeUnion, on the other hand, contends that its litigation costs should be offset against Equistar's damages first, and then ClydeUnion is entitled to a judgment on its counterclaim for the damages awarded by the jury. By way of illustration:

---

[7] *See* Tex. Civ. Prac. & Rem. Code § 42.004(b)(1) ("A judgment will be significantly less favorable to the rejecting party than is the settlement offer if . . . the rejecting party is a claimant and the award will be less than 80 percent of the rejected offer . . . .").

28

**Equistar's Calculation**

| $469,133.24 | − $150,781.06 | = $318,352.18 |
|---|---|---|
| Equistar's Damages[8] | ClydeUnion's Damages | The "amount the claimant recovers or would recover before . . . subtracting as an offset an award of litigation costs" under Tex. Civ. Prac & Rem. Code § 42.004(d). |
| | | − $1,277,167.30 |
| | | ClydeUnion's Litigation Costs |
| | | ───────────── |
| | | = $0 |
| | | Judgment for ClydeUnion Because Litigation Costs Awarded as an Offset and May Not Exceed Equistar's Recovery |

**ClydeUnion's Calculation**

| $469,133.24 | − $1,277,167.30 | = $0 |
|---|---|---|
| Equistar's Damages | ClydeUnion's Litigation Costs | Interim Calculation Because Litigation Costs Awarded as an Offset May Not Exceed Equistar's Recovery |
| | | + $150,781.06 |
| | | ClydeUnion's Damages |
| | | ───────────── |
| | | = $150,781.06 |
| | | Judgment for ClydeUnion |

This issue appears to be one of first impression.

We interpret statutes and rules alike by looking to their language and construing them according to their plain meaning. *See In re Bridgestone Ams. Tire Operations, LLC*, 459 S.W.3d 565, 569 (Tex. 2015). If a rule of procedure conflicts with a statute, generally the statute prevails. *See Johnstone v. State*, 22 S.W.3d 408, 409 (Tex. 2000). Undefined terms are typically given their ordinary

---

[8] The jury awarded Equistar damages of $391,694, and ClydeUnion stipulated that ClydeUnion owed liquidated damages of $77,439.24.

29

meaning, but if a different or more precise definition is apparent from the term's use in the context of the statute, we apply that meaning. *Greater Houston P'ship v. Paxton*, 468 S.W.3d 51, 58 (Tex. 2015). We do not give a term a meaning that is out of harmony or inconsistent with other terms in the statute. *Id.* Thus, if an undefined term has multiple meanings, we recognize and apply only the meanings that are consistent with the statutory scheme as a whole. *Id.*

ClydeUnion contends that its calculation is supported by the analysis in *Bobo v. Varughese*, 507 S.W.3d 817 (Tex. App.—Texarkana 2016, no pet.). *Bobo* addressed whether prejudgment interest should be included in the claimant's "award" for determining whether the claimant's "judgment" would be significantly less favorable than the settlement offer. *See id.* at 828–29.[9] *Bobo* interpreted the meaning of the word "award" in the statute—although the corresponding procedural rule uses the word "judgment" in place of "award"—and concluded that prejudgment interest should not be included when determining whether a claimant's judgment is significantly less favorable than the settlement offer. *See id.*

The issue in this case, however, does not depend on determining whether Equistar's "award" was at least eighty percent of the settlement offer. The applicable terms in the statute are "recover" and the claimant's "recovery." As understood in the field of law, "recovery" means the "obtainment of a right to something (esp. damages) by a judgment or decree" or the "amount awarded in or collected from a judgment or decree." *Recovery*, *Black's Law Dictionary* 1302 (8th ed. 2004). "Recover" means: "To obtain by a judgment or other legal process"; "To obtain (a judgment) in one's favor"; or "To obtain damages or other relief; to succeed in a lawsuit or other legal proceeding." *Recover*, *Black's Law Dictionary*, *supra*, at 1302. Although "award" sometimes refers to the amount of damages

---

[9] *See supra* note 7.

found by a fact finder,[10] "recovery" is understood as the amount of damages allocated in a judgment. *See Gilcrease v. Garlock, Inc.*, 211 S.W.3d 448, 458 (Tex. App.—El Paso 2006, no pet.) (distinguishing between the jury's "award" of damages and the amount "recovered" in the judgment).

Section 42.004 provides that an award of litigation costs "may not be greater than the total amount the claimant recovers or would recover before . . . subtracting as an offset an award of litigation costs under this chapter in favor of the defendant," and that litigation costs "shall be awarded to the defendant in the judgment as an offset against the claimant's recovery from the defendant." Tex. Civ. Prac. & Rem. Code § 42.004(d), (g). The plain meaning of this statute requires a court to determine the total amount of the claimant's recovery from the defendant "before . . . subtracting as an offset" the defendant's litigation costs.

Following this procedure, the trial court should have first offset ClydeUnion's damages against Equistar's damages to determine the total amount that Equistar would have recovered before subtracting ClydeUnion's litigation costs: $318,352.18. Then, the trial court should have awarded ClydeUnion's litigation costs as an offset against Equistar's recovery, but no greater that the total amount Equistar would have recovered before subtracting the litigation costs. Following this procedure results in a take-nothing judgment for both parties. If the trial court did not follow this procedure when rendering a judgment for ClydeUnion in the amount of $150,781.06, the court erred.

Equistar's fourth issue is sustained.

---

[10] *See Bobo*, 507 S.W.3d at 828; *see also Carl J. Battaglia, M.D., P.A. v. Alexander*, 177 S.W.3d 893, 913 (Tex. 2005) (Brister, J., concurring and dissenting) (noting that "an 'award' can mean *either* the jury verdict *or* the final judgment").

## VI. CONCLUSION

Having overruled Equistar's first two issues and sustained its third and fourth issues, we conclude that the trial court's judgment must be reversed, and we render a judgment that Equistar and ClydeUnion take nothing on their claims.[11]


/s/     Ken Wise
        Justice


Panel consists of Justices Wise, Jewell, and Poissant.

---

[11] ClydeUnion raises a "conditional cross-point" in its appellee's brief concerning the trial court's ruling on a summary judgment motion. ClydeUnion asks this court to reverse the trial court's partial summary judgment "*only*" in the event this court remands the case for a new trial. Because we do not remand the case for a new trial under Equistar's first two issues, we do not address ClydeUnion's purported conditional cross-point.