SELECTOUCH CORPORATION,
Appellant,

v.

PERFECT STARCH, INC. and Second
Source Systems, Inc., Appellees.

No. 05–02–00470–CV.

Court of Appeals of Texas,
Dallas.

July 31, 2003.

W.T. "Skip" Leake, Arlington, for Appellant.

Lance S. Baxter, McKinney, for Appellee.

Before Justices MOSELEY, LANG, and LAGARDE.[1]

## OPINION

Opinion by Justice LANG.

SelecTouch Corporation (SelecTouch) appeals a judgment for money damages and attorneys' fees entered against it following a nonjury trial. Perfect Starch, Inc. (Perfect) and Second Source Systems, Inc. (Second Source) sued SelecTouch for breach of contract and breach of warranty relating to electronic membrane switch panels manufactured by SelecTouch. In three issues, SelecTouch challenges the sufficiency of the evidence to support the trial court's finding that the switch panels were improperly manufactured, which caused them to fail. We affirm the trial court's judgment.

### FACTUAL AND PROCEDURAL BACKGROUND

Perfect manufactures washing machines and starch cooking machines. Perfect contracted with Second Source to produce electronics for the machines. Second Source in turn contracted with SelecTouch to produce membrane switch panels to fulfill part of the contract with Perfect. The trial court found that Perfect was a third-party beneficiary of the contract between Second Source and SelecTouch.

Each membrane switch panel contained a row of three or four membrane button switches and another row of eight membrane button switches with two rows of light emitting diodes (LEDs) above to indicate the different functions of the eight switches. Each switch panel contained at least sixteen LEDs. The switch panels were of two types, one for dispensing soap and one for dispensing starch.

Second Source delivered a purchase order to SelecTouch for six good working switch panels with overlays, tooling, art and film, and engineering. SelecTouch never delivered the tooling, art and film, and engineering to Second Source. SelecTouch did deliver the six switch panels and Perfect paid Second Source, which in turn paid SelecTouch, $2450 for the initial purchase order.

The six switch panels worked for a short period of time before failing. Before the initial order failed, Perfect and Second Source placed an order for an additional 100 switch panels of two types, and art and film. The price for the second order was $3845, and Perfect paid this amount to Second Source, which then paid the same amount to SelecTouch. The trial court found these switch panels were delivered with the LEDs installed backwards.

SelecTouch attempted to replace the defective switch panels on a piece-by-piece basis, but never replaced all of them. The switch panels that were replaced worked only for a short time. At most, only ten to twelve switch panels worked for any length of time. The trial court found the switch panels were improperly manufactured by SelecTouch, which caused them to fail. The trial court also found SelecTouch did not replace all defective switch panels as it had warranted to do.

The trial court awarded Perfect and Second Source damages in the amount of $6295, reasonable and necessary attorneys' fees of $3000, prejudgment and post-judgment interest, and costs. SelecTouch requested findings of fact and conclusions of law, which the trial court filed. The trial court denied SelecTouch's request for ad-

1. The Honorable Sue Lagarde, Justice, Court of Appeals, Fifth District of Texas at Dallas, Retired, sitting by assignment.

ditional findings of fact and conclusions of law.

## STANDARD OF REVIEW AND APPLICABLE LAW

■ Findings of fact in a non-jury trial have the same force and dignity as a jury's verdict. *Catalina v. Blasdel*, 881 S.W.2d 295, 297 (Tex.1994); *Ashcraft v. Lookadoo*, 952 S.W.2d 907, 910 (Tex.App.-Dallas 1997), *pet. denied*, 977 S.W.2d 562 (Tex.1998) (per curiam). When a complete reporter's record is filed, the trial court's fact findings may be reviewed for legal and factual sufficiency under the same standards as jury verdicts. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996) (per curiam); *Catalina*, 881 S.W.2d at 297. In reviewing a legal sufficiency issue, we consider only the evidence and inferences that tend to support the challenged findings and disregard all evidence and inferences to the contrary. *Catalina*, 881 S.W.2d at 297. If there is more than a scintilla of evidence to support the findings, the legal sufficiency challenge cannot be sustained. *Id.* We review a factual sufficiency challenge by examining all of the evidence presented at trial, and will set aside a finding only if the evidence is so weak or the finding so against the great weight and preponderance of the evidence that it is clearly wrong and unjust. *Zieben v. Platt*, 786 S.W.2d 797, 799 (Tex.App.-Houston [14th Dist.] 1990, no writ); *see also Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986) (per curiam).

The parties have generally treated this case as a common law breach of contract and breach of warranty case. However, this case involves a contract for the sale of goods. Contracts relating to the sale of goods are governed by article two of the Uniform Commercial Code (UCC), adopted in Texas as chapter two of the business and commerce code. *See* TEX. BUS. & COM.CODE ANN. § 2.102 (Vernon 1994).

■ SelecTouch argues that under the UCC, breach of contract damages are not available for delivery of non-conforming goods. *See Chilton Ins. Co. v. Pate & Pate Enters., Inc.*, 930 S.W.2d 877 (Tex. App.-San Antonio 1996, writ denied). However, the critical factor in whether the buyer has a breach of contract or a breach of warranty claim is whether the buyer has finally accepted the goods. *See* TEX. BUS. & COM.CODE ANN. §§ 2.711, 2.714; *Paul Mueller Co. v. Alcon Labs., Inc.*, 993 S.W.2d 851, 855 (Tex.App.-Fort Worth 1999, no pet.). Only after the buyer finally accepts and can no longer revoke his acceptance, is he limited to recovering under section 2.714. If the seller tenders non-conforming goods, the buyer may reject them, or he may later revoke his acceptance under section 2.608 if the non-conformity was difficult to discover before acceptance. *See* TEX. BUS. & COM.CODE ANN. §§ 2.601, 2.608. A buyer who rightfully rejects the goods or justifiably revokes his acceptance may recover breach of contract remedies for delivery of non-conforming goods under section 2.711, including "recovering so much of the price as has been paid." TEX. BUS. & COM.CODE ANN. § 2.711(a); *see Paul Mueller*, 993 S.W.2d at 855; *Aztec Corp. v. Tubular Steel, Inc.*, 758 S.W.2d 793, 799–800 (Tex.App.-Houston [14th Dist.] 1988, no writ) (under 2.711(a), aggrieved buyer is entitled to recover as much of the contract price as he has paid). Alternatively, the buyer may accept the goods despite the non-conformity and recover damages for the non-conformity, including breach of warranty, plus incidental and consequential damages. TEX. BUS. & COM.CODE ANN. §§ 2.714, 2.715.

## APPLICATION OF LAW TO FACTS

■ In its first issue, SelecTouch apparently challenges the factual sufficiency

of the evidence to support the findings of breach of contract and breach of warranty. SelecTouch frames its issue by stating that the trial court's conclusion is "so against the great weight and preponderance of the evidence as to be manifestly unjust." A great weight challenge is a challenge of the factual sufficiency of the evidence to support an adverse finding where the complaining party had the burden of proof. *See Dow Chem. Co. v. Francis,* 46 S.W.3d 237, 242 (Tex.2001) (per curiam); *Croucher v. Croucher,* 660 S.W.2d 55, 58 (Tex.1983). SelecTouch did not have the burden of proof on the breach of contract or breach of warranty issues. The trial court found against SelecTouch on these issues. As a result, the appropriate issue on appeal is that there is insufficient evidence to support the specific findings. *Croucher,* 660 S.W.2d at 58.

■ It appears SelecTouch is attacking the factual sufficiency of the evidence by framing its issue as a "great weight" challenge and by relying on evidence contrary to the trial court's findings, a scope of review appropriate only for factual sufficiency points. *See Plas–Tex, Inc. v. U.S. Steel Corp.,* 772 S.W.2d 442, 445 (Tex.1989) (per curiam). However, SelecTouch requests us to reverse and *render* judgment in its favor, a disposition only available for legal sufficiency challenges. *See Vista Chevrolet, Inc. v. Lewis,* 709 S.W.2d 176, 176 (Tex.1986); *Nat'l Life & Accident Ins. Co. v. Blagg,* 438 S.W.2d 905, 909 (Tex. 1969). We have no jurisdiction to render judgment on a great weight and preponderance of the evidence point. *Wright Way Spraying Serv. v. Butler,* 690 S.W.2d 897, 898 (Tex.1985) (per curiam). Because we are required to liberally construe the briefing rules, we will consider Selec-Touch's first issue as raising both legal and factual insufficiency points. *See* Tex. R.App. P. 38.9.

■ SelecTouch's second and third issues complain that the evidence is legally or factually insufficient to show either the cause in fact or proximate cause for the failure of the switch panels. Cause in fact and proximate cause are but specific applications of the rule that a plaintiff must produce evidence from which the factfinder may reasonably infer that the damages sued for have resulted from the conduct of the defendant. *See generally Haynes & Boone v. Bowser Bouldin, Ltd.,* 896 S.W.2d 179, 181 (Tex.1995); *McKnight v. Hill & Hill Exterminators, Inc.,* 689 S.W.2d 206, 209 (Tex.1985). SelecTouch does not question that the failure of the switch panels resulted in damages to Second Source and Perfect. Rather, SelecTouch complains about whether its conduct caused the switch panels to fail, i.e., whether it breached the contract or breached its warranty. Thus, the second and third issues are the same as the first, whether the evidence was legally and factually sufficient to support the finding that Selec-Touch breached the contract and breached its warranties. We discuss all three issues together and will treat them as raising both legal and factual sufficiency challenges to the findings of fact.

SelecTouch expressly challenges only part of one of the trial court's findings of fact: that "[t]he switches were improperly manufactured by the Defendant, which caused them to fail." We examine whether the evidence is legally and factually sufficient to support this finding.

## A. Legal Sufficiency

■ In addressing the legal sufficiency of the evidence, we consider only the evidence and inferences in favor of the finding. We have marshaled that evidence below. The evidence is undisputed that the tooling, art, and film were never delivered. Second Source's president testified

the six switch panels in the first order were manufactured according to the drawing and were functional when delivered. However, he testified that after a short while, the LEDs became intermittent and would not light correctly. He and other witnesses described the switch panels as including an encapsulate around the LED to hold it in place. This encapsulate and the LED were glued together with epoxy. According to Second Source, the epoxy was badly mixed or cured and started to crumble away from the switch or encapsulate. If properly manufactured, the switch panels should last indefinitely. SelecTouch's production manager at the time explained that the encapsulate was put in correctly, but it was not covering the LED sufficiently. SelecTouch's electrical engineering expert agreed that the bonding between the material and the light (LED) will affect whether the light works. He said if the light comes loose from the backing, it will fail to make a connection and the light will not function. He said intermittent operation of an LED is possible if it is not epoxied or glued down to make a good connection.

Several witnesses, including SelecTouch's production manager, testified that the 100 switch panels in the second order were delivered with all of the LEDs installed backwards. SelecTouch's production manager testified that he became involved after the problems began with the 100 switch panels in the second order, and he produced "several hundred" switch panels to replace the ones delivered to Second Source. The production manager believed at least two batches of switch panels were made with the LEDs installed backwards, but could not say exactly how many switch panels were involved because he was making them in groups of twenty or twenty-five at a time. The representatives of Second Source and Perfect testified that these 100 switch panels never worked,

they were never put on a machine, and all were returned to SelecTouch. When the 100 switch panels were delivered, they were tested by both Second Source and Perfect. They did not work. Second Source and Perfect complained to SelecTouch immediately or within days of delivery. SelecTouch's sales manager testified she received a telephone call from Second Source immediately after delivery complaining that the 100 switch panels were not working and the LEDs were installed backwards. She recalled seeing the 100 switch panels back at SelecTouch's offices. She said the returned switch panels were not working and the LEDs were installed backwards. SelecTouch's expert agreed that one of the reasons a switch panel might not work is that the LEDs were put in backwards, saying, "A light put in backwards will never ever turn on. One ever turning on will work."

According to Perfect's co-owner, all switch panels were returned to SelecTouch. Both Second Source and Perfect offered evidence that the replacement switch panels either did not work at all or failed within a few days after replacement. Perfect's co-owner testified the problem with the switch panels was incorrect manufacturing. He said of all the switch panels made (i.e., the six in the first order, the 100 in the second order, and the replacements), only ten to twelve were functional. The switch panels that worked only did so for a few days. He said what SelecTouch delivered was a device that could not be used. Both Perfect and Second Source made repeated oral complaints about the problems with the switch panels. They received assurances from SelecTouch that the problems would be fixed, but the replacements also failed. Eventually, both Perfect and Second Source sent letters to SelecTouch demanding a full refund for both orders.

We conclude this evidence "rises to a level that would enable reasonable and fair-minded people to differ in their conclusions," and is more than a scintilla. *Transp. Ins. Co. v. Moriel,* 879 S.W.2d 10, 25 (Tex.1994). The evidence is legally sufficient to support the trial court's finding that the switch panels were improperly manufactured by SelecTouch, which caused them to fail.

### B. Factual Sufficiency

In reviewing the factual sufficiency issue, we consider all of the evidence. *See Plas–Tex,* 772 S.W.2d at 445. SelecTouch points to evidence that the first six switch panels were manufactured to the specifications approved by Second Source and that the LEDs on these switch panels worked. SelecTouch's expert said that if an LED ever came on, it was installed correctly. Also, SelecTouch presented evidence that it replaced every switch panel that was returned. However, Second Source and Perfect presented evidence that although the first six switch panels were electrically correct when delivered, they later failed due to the encapsulate and epoxy problems. They also presented evidence that the 100 switch panels constituting the second order did not work when delivered, were all returned, and that the replacement switch panels either did not work or failed soon after delivery.

SelecTouch suggested the failures may have been caused by mishandling of the switch panels or by failure to regulate the voltage or current used in the equipment. SelecTouch's expert opined that the most likely cause of the failure of the LEDs was the failure to control the current through the LED. Second Source and Perfect denied any mishandling of the switch panels and presented evidence that nothing in the electronics would have caused the switch panels to fail. The president of Second Source said the switch panels never received more than five volts.

Second Source and Perfect produced evidence that the failures of the switch panels were due either to the LEDs being installed backwards or to the encapsulate problems. They presented evidence that the LEDs in the 100 switch panels in the second order were all installed backwards and would not work. SelecTouch's expert agreed that a light installed backwards would not work. There was some evidence that all of the switch panels had problems with the epoxy or the encapsulate covering the LED. Also, SelecTouch's expert agreed that problems with the epoxy or gluing of the LED could cause intermittent operation of the light.

SelecTouch suggests in its brief that Perfect's co-owner admitted Perfect changed the electronic design when it went to another manufacturer for the switch panels. However, Perfect's co-owner testified that the new manufacturer slightly changed the leads connecting to the switch panel, but "[t]hey haven't changed it electrically in any way from the original design of the six that did work." He testified that the schematic delivered to SelecTouch was essentially the same as the one used by the new manufacturer. SelecTouch's vice president confirmed that the electric schematic delivered to SelecTouch appeared to be the same as the schematic used by the new manufacturer. Perfect had no problems with the switch panels made by the new manufacturer using the same schematic.

The evidence regarding the cause of the failure of the switch panels was conflicting. SelecTouch's expert testimony was not controlling, was inconsistent in part, and was controverted by an experienced manufacturer of electronics. Second Source's president had worked with electronics most of his adult life, including ten years

in the military, ten years at Texas Instruments, and ten years as a business owner. Also, SelecTouch's expert presented an in-court demonstration, which cannot be accurately presented in a record of the spoken testimony.

The trial court as trier of fact was the exclusive judge of the witnesses' credibility and the weight to be given their testimony. *Ashcraft*, 952 S.W.2d at 910. When presented with conflicting evidence, the factfinder may believe one witness and disbelieve others. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986). The factfinder may resolve inconsistencies in the testimony of any witness and may accept lay testimony over expert testimony. *Id.* Expert opinion testimony, even if uncontroverted, is not conclusive on the trier of fact, unless the subject is one for experts alone. *Id.* We conclude the trial court was in the best position to judge the evidence. After considering all of the evidence, the evidence supports the finding that the switch panels were improperly manufactured, which caused them to fail. The finding is factually sufficient. *Cain*, 709 S.W.2d at 176.

### CONCLUSION

Because the evidence is legally and factually sufficient to support the challenged finding of fact, we resolve all of SelecTouch's issues against it. The judgment of the trial court is affirmed.