# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-20-00431-CV

**Scientific Machine & Welding, Inc., Appellant**

**v.**

**FlashParking, Inc., Appellee**

**FROM THE 459TH DISTRICT COURT OF TRAVIS COUNTY
NO. D-1-GN-19-003816, THE HONORABLE TIM SULAK, JUDGE PRESIDING**

## O P I N I O N

Appellant Scientific Machine & Welding, Inc. sued appellee FlashParking, Inc. for breach of contract, and alternatively, if no valid contract was found to exist, for recovery under quantum meruit. FlashParking moved for summary judgment, arguing that Scientific had repudiated the parties' contract, that Scientific cannot recover under quantum meruit because the parties had an express contract, and that there is no evidence of damages. The trial court granted a take-nothing summary judgment disposing of all claims in favor of FlashParking. Because we conclude that a valid contract existed between the parties and FlashParking established as a matter of law that Scientific repudiated the parties' express contract, we affirm.

## BACKGROUND

Scientific is a manufacturing company that makes specialty machine parts. FlashParking (formerly known as KleverLogic, Inc.) sells software and hardware to assist its customers with parking solutions. In 2016, Scientific began manufacturing parking-payment

kiosks ("SmartStations") for FlashParking. Both FlashParking, as applicant, and Scientific, as manufacturer, entered into separate contracts (the Applicant Contract and the Factory Contract, respectively) with MET Laboratories, Inc. ("METLabs") to certify the Underwriters Laboratories (UL) compliance of the SmartStations.

UL compliance is a safety certification required for most electrical products, and the evidence is undisputed that the SmartStations are unmarketable without the UL-compliance mark. FlashParking's expert attested that UL is a not-for-profit organization that sets safety standards for different products, including information-technology equipment to be installed outdoors. Certification of UL compliance requires a third-party inspector or auditor, such as METLabs, to confirm that the product is manufactured and tested in a way that meets industry safety standards. After METLabs authorized Scientific to apply the METLabs certification mark denoting UL compliance ("MET Mark") to FlashParking's SmartStations in 2016, FlashParking required all SmartStations to be UL compliant in both components and manufacturing process. This contract dispute arose when FlashParking canceled its contract with Scientific in 2018, asserting that Scientific had repudiated the contract by refusing to take the necessary steps to maintain its certification to produce UL-compliant SmartStations.

**Factual background**

In 2016, FlashParking agreed to purchase 500 certified UL-compliant SmartStations from Scientific in installments. That agreement was finalized and reduced to writing in a document titled "Letter of Intent-Turnkey production of products," which was executed in January 2017. In connection with this agreement, FlashParking issued a purchase order in December 2016 ("2016 Purchase Order") for 500 SmartStations, in the amount of

2

approximately $1.5 million, with 250 to be delivered in three installments by April 2017 and the remainder to be scheduled for delivery at a later time.

Scientific was authorized to apply the MET Mark to SmartStations, as long as Scientific complied with the terms of the August 22, 2016 Factory Contract.[1] The 2016 Factory Contract allowed METLabs to conduct unannounced inspections of Scientific's factory and required Scientific to comply with "very basic quality requirements" to allow METLabs the capability to perform factory inspections. The 2016 Factory Contract further provided that "*[u]pon demand* made by MET[Labs], the Factory shall immediately terminate application of the MET Mark to any product(s) stipulated at any time by MET[Labs] to be ineligible." (Emphasis added.) When METLabs conducted an inspection of Scientific's factory on August 31, 2017, Scientific was found to be in compliance.

In early May 2018, Kevin Rose, one of Scientific's employees, went to work for FlashParking. FlashParking's Vice President of Operations, Wes Vinecombe, attested that Scientific's president and sole shareholder, Alan Basta, became very angry when FlashParking hired Rose.[2] Vinecombe further averred, and Scientific has not disputed, that Basta refused (1) to deliver any additional SmartStations, including 165 SmartStations that were still owed and due from the 2016 Purchase Order and that had already been completed and were awaiting delivery; (2) to return the consigned parts that Scientific was holding, which belonged to FlashParking and

---

[1] The 2016 Factory Contract provided for automatic renewal for periods of one year from the anniversary date, unless otherwise terminated for cause or if any party gave 30 days' prior written notice of its intent to terminate.

[2] Scientific sued Rose on August 29, 2018. The trial court granted Rose's summary-judgment motion, and Scientific has appealed that judgment to this Court in Cause No. 03-20-00564-CV.

3

were worth $360,000; and (3) to return the $84,465 that FlashParking had paid as a deposit on the completed SmartStations—unless and until FlashParking fired Rose.

Vinecombe attested that when FlashParking refused to comply with Scientific's demand that it fire Rose, Basta stated that the only other way that Scientific would continue to do business with FlashParking would be if FlashParking (1) placed an additional purchase order for 400 SmartStations at a cost of approximately $1.2 million and (2) paid Scientific an additional $99,000 for the remaining 165 SmartStations that had not yet been delivered under the 2016 Purchase Order.[3] According to Vinecombe, Basta promised that this additional $99,000 would be returned to FlashParking once they took delivery of the 400 units that he was requiring FlashParking to buy. Vinecombe testified in his deposition that Basta's withholding of inventory was a "major business disruption" for FlashParking, causing it to have "no clear way to fulfill [its] obligations" both to its investors and its customers. Vinecombe averred that FlashParking agreed to the proposal because it had imminent deadlines to fill customer orders and no other source for the SmartStations. On May 22, 2018, FlashParking issued a purchase order for an additional 400 SmartStations ("2018 Purchase Order").

The 2018 Purchase Order required that all SmartStations be "UL compliant in both components and manufacturing process." The 2018 Purchase Order also provided that the 400 SmartStations would be delivered in installments, with the first installment of 100 units to be delivered on October 15, 2018, and the balance to be delivered "subject to a release schedule." FlashParking began to take delivery of some of the 165 SmartStations that were already completed under the 2016 Purchase Order, and it paid $49,200 of the $99,000 additional payment. On

---

[3] This payment was described by FlashParking as a "duress premium" and by Scientific as a "Cancellation Credit."

July 26, 2018, Scientific issued an invoice for the 50% deposit for the first 100 units that were to be delivered on October 15, 2018. However, soon after the invoice was issued, FlashParking received notice that Scientific had failed an unannounced July 25 inspection by METLabs of its manufacturing facility and that METLabs would not allow Scientific to use its MET Mark on SmartStations until the compliance issues were corrected.

To remedy some of the compliance issues, METLabs required that Scientific "submit, as soon as possible," a completed Project Amendment Request form with its new manufacturing facility's address, the name change from KleverLogic to FlashParking, and the new FlashParking logo design.[4] Vinecombe testified that after the failed inspection, FlashParking's METLabs representative emailed him a new Factory Contract ("2018 Factory Contract") to forward to Scientific to sign. On August 8, 2018, Vinecombe emailed the new 2018 Factory Contract to Basta for Scientific to execute. Vinecombe explained to Basta that it was the same Factory Contract document that Scientific executed in 2016 as part of the initial UL-compliance certification. Vinecombe informed Basta that METLabs was requiring the new 2018 Factory Contract to be signed because of Scientific's move of the SmartStation assembly location and because of FlashParking's name change. Vinecombe further explained that FlashParking had filed application paperwork in 2017 with METLabs to change its name and Scientific's location and that FlashParking had completed part of the application process by executing a proposal and

---

[4] Scientific had moved its manufacturing facility for SmartStations to a new location in 2017. The 2016 Factory Contract stated that for purposes of the contract, "a 'Factory' is defined as a location in which main assembly and/or certification critical testing and/or application of certification labeling is performed," and that *"[o]nly the product(s)* designed and engineered by the Applicant [FlashParking] and/or *manufactured by the Factory [Scientific] at the Factory at the above address, which have been authorized by MET[Labs] to bear the appropriate MET certification . . . are covered by this Contract*." (Emphasis added.) Scientific's address on the 2016 Factory Contract was its original facility's address.

issuing a purchase order. However, midway through the process, METLabs changed account executives on the FlashParking account, and FlashParking was not made aware until after the failed inspection that these changes required the execution of new Factory and Applicant Contracts. Vinecombe further stated:

> I know they attempted to perform a surprise factory inspection and as a result of their failure to guide us through the process have issued FlashParking a notice of serious non-compliance and *de-authorized us from applying the METLabs mark from our equipment.*
>
> They have acknowledged their failure in this and have assured me that *as soon as they receive the executed (Factory and Applicant) contracts back they will expedite the file modification process and re-authorize the use [o]f the MET mark.*

(Emphasis added.)

On August 9, Sean McCain, Scientific's controller, returned the 2018 Factory Contract to FlashParking. It was signed but with handwritten amendments, including striking the provision requiring Scientific's agreement to unannounced factory inspections, the provision prohibiting Scientific's application of the MET Mark to unauthorized products, and the provision requiring Scientific to indemnify and hold harmless METLabs from any claims arising from such unauthorized action. Vinecombe called the METLabs representative to find out if METLabs would accept changes to the Factory Contract document, and she told him that it would not. He then emailed McCain to let him know that METLabs would not accept modifications to the contract and asked McCain to advise whether Basta would execute the 2018 Factory Contract without modification. On August 10—only two months before Scientific was supposed to deliver 100 UL-compliant SmartStations to FlashParking—McCain emailed Vinecombe to inform him that Scientific had reviewed the contract both internally and with outside counsel and that

6

Scientific "cannot sign the Factory Contract with the hold harmless and indemnify wording. There is too much potential exposure for [Scientific]."

On August 28, 2018, with the October 15 delivery deadline rapidly approaching, FlashParking's CEO, Juan Rodriguez, sent a letter to Basta, recounting the facts surrounding METLabs' requirement that Scientific enter into a successor contract after the failed inspection and explaining that "METLabs obviously will not certify the SmartStations as UL compliant as Scientific is not in compliance with the existing MetLabs contract and has informed us of its business decision not to enter into a successor contract with MetLabs." Rodriguez further explained that Scientific's "refusal to contract with METLabs is a repudiation of the critical requirement in the May 2018 Purchase Order that specifically stipulates that the SmartStations will be UL compliant," and accordingly, FlashParking was terminating its relationship with Scientific, canceling the pending 2018 Purchase Order, and shifting its production of SmartStations to an alternative, UL-compliant source.

Basta responded by email on September 7, asserting that this was the first time that Scientific had been told about a negative UL inspection, that "all of the major real issues were actually [FlashParking] issues," that Scientific had executed a copy of the 2018 Factory Contract, and that it had not been "given any real opportunity to cure any perceived issue" but "every UL issue was/is easily resolvable."[5] Basta stated that Scientific wanted to manufacture SmartStations for FlashParking and that the parties should "get our heads together and figure out how [Scientific] can still manufacture for [FlashParking]." He did not, however, indicate a willingness to sign the

_____

[5] In his affidavit, Basta attested that he never received the METLabs inspection report before September 4, 2018, although he acknowledges receiving Vinecombe's August 8, 2018 email requesting the execution of the new 2018 Factory Contract and explicitly stating that METLabs had de-authorized use of its UL mark because of the factory inspection.

METLabs 2018 Factory Contract without modifications or suggest that Scientific had procured another third-party company to enable it to produce UL-compliant SmartStations. Nor did Basta describe any steps taken by Scientific to remedy the non-compliance issues preventing it from shipping UL-compliant SmartStations.

Rodriguez responded by email on September 11 that there were three areas that FlashParking needed to better understand. In particular, "[r]egarding the factory contract: we thought that [Scientific] rejected some of MET[Lab']s standard contract language and made the ultimate decision that [Scientific] couldn[']t accept the liability required by the factory contract." In addition, regarding the UL inspection, Rodriguez explained that FlashParking thought that the inspection report had been delivered to Scientific's personnel in July "and that the restriction on shipping product was not resolved." Rodriguez also stated that FlashParking was looking forward to receiving an account reconciliation from McCain and would like to meet with Basta and McCain "to discuss these three issues, clear up any misunderstandings, and work on resolving the issues between our firms in a mutually-agreeable framework, including the potential for a renewed relationship between our firms." The record does not reflect any further communications between the parties before Scientific sued FlashParking the next year in July 2019.

**Procedural background**

FlashParking moved for summary judgment on three grounds. First, it asserted its affirmative defense of repudiation to Scientific's breach-of-contract claim, contending that Scientific repudiated the contract by failing to maintain the certification necessary to deliver UL-compliant goods, thus allowing FlashParking to cancel its obligation to purchase SmartStations from Scientific. Second, FlashParking asserted that Scientific could not recover on its alternative

quantum meruit claim because there was an express contract governing the goods at issue. Third, FlashParking moved for no-evidence summary judgment on the damages element of Scientific's breach-of-contract claim. FlashParking submitted summary-judgment evidence with its motion, and Scientific likewise submitted summary-judgment evidence with its response. The trial court overruled Scientific's objections to FlashParking's summary-judgment evidence, but it granted some of FlashParking's objections to Scientific's summary-judgment evidence. The trial court granted FlashParking's summary-judgment motion without stating the basis for its order. This appeal followed.

## ANALYSIS

On appeal, Scientific asserts in its first issue that the trial court erred in granting FlashParking's summary-judgment motion. In four sub-issues, it contends that (1) FlashParking failed to carry its burden of showing that it was entitled to judgment as a matter of law on Scientific's breach-of-contract claim; (2) even if the burden shifted to Scientific to raise fact issues, it did so; (3) the trial court erred by granting summary judgment on Scientific's quantum meruit claim; and (4) Scientific presented sufficient evidence of damages to defeat FlashParking's no-evidence motion. Scientific asserts in its second issue that the trial court abused its discretion by striking certain affidavit testimony on the additional $99,000 payment that was part of the 2018 Purchase Order.

**Summary-judgment standard of review**

We review the trial court's decision to grant summary judgment de novo. *Valence Operating Co. v. Dorsett*, 164 S.W.3d 656, 661 (Tex. 2005). To prevail on a summary-judgment motion, the movant must demonstrate that there are no genuine issues of material fact and that it

9

is entitled to judgment as a matter of law. Tex. R. Civ. P. 166a(c); *KMS Retail Rowlett, LP v. City of Rowlett*, 593 S.W.3d 175, 181 (Tex. 2019). A defendant seeking summary judgment on an affirmative defense has the burden to conclusively establish that defense. *See Draughon v. Johnson*, No. 20-0158, ___ S.W.3d ___, 2021 WL 2387430, at *3–4 (Tex. June 11, 2021). Once the defendant has established a right to summary judgment on an affirmative defense, the burden shifts to the plaintiff to present controverting proof that precludes summary judgment. *See Huckabee v. Time Warner Entm't Co., L.P.*, 19 S.W.3d 413, 420 (Tex. 2000). When reviewing a summary judgment, we take as true all evidence favorable to the nonmovant, and we indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *Provident Life & Accident Ins. v. Knott*, 128 S.W.3d 211, 215 (Tex. 2003). When the trial court does not specify the grounds for granting the motion, we must uphold the judgment if any ground asserted in the motion and preserved for appellate review is meritorious. *Id.* at 216.

## I.      Anticipatory repudiation

Because the dispositive issue in this case is whether FlashParking conclusively established its affirmative defense of repudiation to defeat Scientific's breach-of-contract claim, we turn first to that issue. In its summary-judgment motion, FlashParking argued that Scientific repudiated the contract by failing to maintain the certification necessary to deliver UL-compliant SmartStations, which occurred when it refused to sign the 2018 Factory Contract required by METLabs and failed to make arrangements with another UL-approved inspector. On appeal, Scientific argues in its first two sub-issues that FlashParking failed to carry its burden to show, or alternatively, that Scientific raised a fact issue on, whether (1) Scientific's refusal to sign the 2018 Factory Contract required by METLabs constituted an unequivocal or unconditional intention not

to perform under the FlashParking contract; (2) a new METLabs contract was required for Scientific to be authorized to ship certified UL-compliant SmartStations; (3) Scientific would be unable to produce certified UL-compliant SmartStations, even if it were unable to use its new facility for manufacturing; (4) the alleged repudiation was "without just excuse"; (5) FlashParking was damaged by it; and (6) FlashParking seized an opportunity to breach. In response, FlashParking contends that the evidence showed that Scientific's refusal to sign the METLabs contract (1) rendered Scientific's performance impossible by rejecting its continuing obligation to remain certified to ship UL-compliant SmartStations or (2) demonstrated a clear determination not to continue with performance. *See* Tex. Bus. & Com. Code § 2.610 cmt. 1, 2. FlashParking asserts that because the Uniform Commercial Code (UCC) applies in this case, it must only prove one of these prongs, and acting without just excuse and damages are not elements of its anticipatory-repudiation affirmative defense.

## A.     Applicable law

The essential elements of Scientific's breach-of-contract claim are: (1) the existence of a valid contract; (2) performance or tendered performance by Scientific; (3) breach of the contract by FlashParking; and (4) damages sustained by Scientific as a result of the breach.[6] *See, e.g.*, *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 n.21 (Tex. 2018). Because

---

[6] "To prove the first element (the existence of a valid contract), the plaintiff must establish that (1) an offer was made; (2) the other party accepted in strict compliance with the terms of the offer; (3) the parties had a meeting of the minds on the essential terms of the contract (mutual assent); (4) each party consented to those terms; and (5) the parties executed and delivered the contract with the intent that it be mutual and binding." *USAA Tex. Lloyds Co. v. Menchaca*, 545 S.W.3d 479, 502 (Tex. 2018). Neither party challenges the validity of the contract on appeal. Based on our review of the record, we conclude that a valid contract exists.

FlashParking asserted repudiation as an affirmative defense, it had the burden of proving that Scientific unequivocally refused to perform the contract. *See, e.g.*, *New York Party Shuttle, LLC v. Bilello*, 414 S.W.3d 206, 216 (Tex. App.—Houston [1st Dist.] 2013, pet. denied) ("Repudiation or anticipatory breach is an unconditional refusal to perform the contract in the future, which can be expressed either before performance is due or after partial performance.").

The parties dispute whether FlashParking was required to establish as a matter of law the common-law elements of (1) the lack of just excuse for Scientific's alleged repudiation and (2) damage to FlashParking.[7] FlashParking contends that this case is governed by the UCC, and thus those elements are not applicable here, while Scientific argues that because the UCC does not define "repudiation," the common-law elements do not conflict with the guidance provided in the UCC's comments. *See Amplify Fed. Credit Union v. Garcia*, No. 03-17-00161-CV, 2017 WL 6757001, at *2 n.1 (Tex. App.—Austin Dec. 19, 2017, no pet.) (mem. op.) ("Although the Official UCC Comments following the code provisions are not law, they are persuasive authority concerning the interpretation of the statutory language." (citing *Lockhart Sav. & Loan Ass'n v. RepublicBank Austin*, 720 S.W.2d 193, 195 (Tex. App.—Austin 1986, writ ref'd n.r.e.))).

We agree that Scientific and FlashParking's agreement for the sale of UL-compliant SmartStations was a contract for the sale of goods governed by the UCC. *See Courey Int'l v. Designer Floors of Tex., Inc.*, No. 03-09-00059-CV, 2010 WL 143420, *3 (Tex. App.—Austin

---

[7] The elements of a common-law claim for anticipatory breach are the following: (1) the allegedly repudiating party has absolutely refused to perform the contract according to its terms, (2) without just excuse for the nonperformance, and (3) damaged the nonrepudiating party. *See, e.g.*, *Taylor Publ'g Co. v. Systems Mktg. Inc.*, 686 S.W.2d 213, 217 (Tex. App.—Dallas 1984, writ ref'd n.r.e.); *but see also Tendeka, Inc. v. Nine Energy Serv. LLC*, No. 14-18-00018-CV, 2019 WL 6872942, at *5 (Tex. App.—Houston [14th Dist.] Dec. 17, 2019, no pet.) (mem. op.) (stating that party who allegedly repudiated contract bore burden of proof on just excuse).

Jan. 15, 2010, no pet.) (mem. op.) (citing Tex. Bus. & Com. Code § 2.102; *SelecTouch Corp. v. Perfect Starch, Inc.*, 111 S.W.3d 830, 834 (Tex. App.—Dallas 2003, no pet.) ("Contracts relating to the sale of goods are governed by article two of the [UCC], adopted in Texas as chapter two of the business and commerce code.")); *see also* Tex. Bus. & Com. Code § 2.105 (defining "goods" as "all things (including specially manufactured goods) which are movable at the time of identification to the contract for sale other than the money in which the price is to be paid, investment securities (Chapter 8) and things in action"). Texas courts apply the UCC to contracts for the sale of goods even if the parties characterize the claim as a common-law breach-of-contract case. *Omni USA, Inc. v. Parker-Hannifin Corp.*, 964 F. Supp. 2d 805, 840 (S.D. Tex. 2013) (citing *Courey Int'l*, 2010 WL 143420 at *3; Tex. Bus. & Com. Code § 2.102; *SelecTouch*, 111 S.W.3d at 834). "Where the Uniform Commercial Code applies, common law rules regarding breach of contract do not apply. To the extent they do not conflict with the Uniform Commercial Code's provisions, common law principles complement the Uniform Commercial Code." *Plano Lincoln Mercury, Inc. v. Roberts*, 167 S.W.3d 616, 624 (Tex. App.—Dallas 2005, no pet.) (citations omitted). The UCC itself provides that "unless displaced by the particular provisions of this title," common-law principles "shall supplement its provisions." Tex. Bus. & Com. Code § 1.103(b); *see also id.* § 1.103 cmt. 2 ("Therefore, while principles of common law and equity may *supplement* provisions of the Uniform Commercial Code, they may not be used to *supplant* its provisions, or the purposes and policies those provisions reflect, unless a specific provision of the Uniform Commercial Code provides otherwise. In the absence of such a provision, the Uniform Commercial Code preempts principles of common law and equity that are inconsistent with either its provisions or its purposes and policies.").

Under the doctrine of repudiation or anticipatory breach, "an injured party is discharged from its remaining duties to perform under a contract where the other party repudiates its contractual duty before the time for performance." *Cook Composites, Inc. v. Westlake Styrene Corp.*, 15 S.W.3d 124, 139 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Traditionally, "repudiation occurs when the promissor unequivocally disavows any intention to perform in the future." *Id.* Under the UCC, if either party repudiates a contract with respect to performance not yet due, the loss of which will substantially impair the value of the contract to the nonrepudiating party, the aggrieved party may either: (1) await performance by the repudiating party for a commercially reasonable time or (2) resort to any remedy for breach provided in Sections 2.703 or 2.711, even if the nonrepudiating party has notified the repudiating party that it would await the latter's performance and has urged retraction. *See* Tex. Bus. & Com. Code § 2.610. In either case, the nonrepudiating party may suspend its own performance. *Id.* Thus, if the seller repudiates, the buyer may cancel the contract and recover so much of the price as has been paid, in addition to its other remedies. *See id.* § 2.711.

The comments to Section 2.610 provide guidance on when anticipatory repudiation occurs under the UCC: "[A]nticipatory repudiation centers upon an overt communication of intention or an action which renders performance impossible or demonstrates a clear determination not to continue with performance." *Id.* § 2.610 cmt. 1. Furthermore, "[i]t is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." *Id.* § 2.610 cmt. 2. In addition, a repudiation automatically results under Section 2.609 "when a party fails to provide adequate assurance of due future performance within thirty days after a justifiable demand therefor has been made." *Id.* Although the repudiating party may retract its repudiation under some

14

circumstances, it cannot do so if the aggrieved party "has since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final." *Id.* § 2.611(a).

We need not determine whether lack of just excuse must be shown by the aggrieved party in a UCC case, because here, as explained below, the summary-judgment evidence conclusively establishes that Scientific's repudiation was not based on a mistake or misunderstanding and that it lacked just excuse. We address below how the UCC affects the element of damages in this case.

### B.     Scientific's refusal to sign the 2018 Factory Contract

To support its argument that its refusal to sign the METLabs 2018 Factory Contract in the required form was not an intentional and unequivocal repudiation of its agreement with FlashParking without just excuse, Scientific argues that the summary-judgment evidence did not establish, or alternatively, it raised a fact issue on, whether METLabs required it to sign a new contract to maintain its UL certification and whether it would have been able to produce SmartStations at its original location.[8] We first consider whether Scientific's refusal to sign was an intentional and unequivocal repudiation before turning to Scientific's arguments that (1) its misunderstanding about whether METLabs required a new contract for Scientific to maintain its certification of UL compliance provided it with just excuse for its repudiation, (2) FlashParking did not establish that it was damaged by the repudiation, and (3) FlashParking seized an opportunity to breach.

---

[8] Scientific still maintained an office and produced metal framing for the SmartStations at its original location.

15

### 1. Scientific's repudiation was intentional and unequivocal

Initially, we note that the common-law definition of intentional and unequivocal repudiation upon which Scientific urges us to rely is incorporated into the UCC comment's definition of repudiation, which requires "an overt communication of intention or an action" that either renders performance impossible or demonstrates clear (i.e., unequivocal) intention not to perform. *Compare* Tex. Bus. & Com. Code § 2.610 cmt. 1, *with Oler v. B-A Homes, Inc.*, No. 03-99-00714-CV, 2000 WL 1508502, at *4 (Tex. App.—Austin Oct. 12, 2000, no pet.) (not designated for publication) (explaining that repudiation "is conduct that shows a fixed intention to abandon, renounce and refuse to perform the contract." (citing *Group Life & Health Ins. Co. v. Turner*, 620 S.W.2d 670, 673 (Tex. App.—Dallas 1981, no writ))). Although repudiation can be difficult to establish in the summary-judgment context, on the facts of this case, reviewed below, we conclude that Scientific's refusal to sign the 2018 Factory Contract was an overt communication of and an action that demonstrated a clear and unequivocal intention not to perform under Scientific's agreement with FlashParking.

The timeline of events is relevant to this determination. Therefore, we provide this summary of key events:

- 2016: Scientific begins manufacturing SmartStations

- Q4 2016: After signing contracts with METLabs, Scientific and FlashParking receive UL-compliance certification for SmartStations manufactured at Scientific's original facility

- December 2016: FlashParking issues 2016 Purchase Order to Scientific for 500 SmartStations

- January 2017: Scientific and FlashParking execute Letter of Intent

16

- February 2017:  Scientific leases new location and subsequently moves manufacturing of SmartStations there

- April 2017:  250 SmartStations are delivered by this date

- August 31, 2017:  METLabs conducts inspection and does not note any noncompliance

- Early May 2018:  Scientific's former employee Rose begins working for FlashParking

- May 22, 2018:  FlashParking issues 2018 Purchase Order for 400 additional SmartStations, which includes an additional $99,000 to be paid on remaining 2016 Purchase Order SmartStations that were not yet delivered

- Late May 2018:  FlashParking begins taking delivery of remaining SmartStations completed under 2016 Purchase Order and pays approximately half of the $99,000 additional payment

- July 25, 2018:  Scientific fails unannounced factory inspection by METLabs, and METLabs prohibits it from shipping SmartStations with the MET Mark certifying UL compliance

- July 26, 2018:  Scientific issues invoice for 50% deposit for the first 100 SmartStations to be delivered under 2018 Purchase Order (according to Purchase Order terms, 50% deposit due two weeks before quarter's start, i.e., mid-September)

- August 8, 2018:  FlashParking emails 2018 Factory Contract for Scientific to execute (with explanation that METLabs was requiring a new contract after the July 25 inspection because of Scientific's move of the manufacturing facility and FlashParking's name change, and further explaining that METLabs would expedite reauthorization of the parties' use of the MET Mark once Scientific executed the Factory Contract)

- August 9, 2018:  Scientific returns the executed Factory Contract with provisions struck that (1) allowed unannounced factory inspections, (2) prohibited Scientific's use of the MET Mark on unauthorized products, and (3) would indemnify METLabs from claims arising from any unauthorized use of the MET Mark by Scientific

17

- August 9, 2018:    FlashParking confirms that METLabs will not accept modifications to Factory Contract and asks Scientific to advise whether it will execute the 2018 Factory Contract without modification

- August 10, 2018:   Scientific informs FlashParking that Scientific will not sign the 2018 Factory Contract without modification

- August 28, 2018:   FlashParking informs Scientific that its refusal to contract with METLabs is a repudiation of the critical requirement in the May 2018 Purchase Order that the SmartStations be UL compliant, and thus, FlashParking is terminating the parties' relationship, canceling the pending 2018 Purchase Order, and shifting its production of SmartStations to an alternative, UL-compliant source

- August 29, 2018:   Scientific sues Rose

- September 7, 2018:  Basta responds to FlashParking's letter, professing no awareness of the negative July 25 inspection and asserting that the UL issues are "easily resolvable" without indicating a willingness to sign the 2018 Factory Contract without modifications or to procure UL-compliance certification from another inspector

- September 11, 2018: FlashParking responds with a willingness to meet to clear up any misunderstandings and discuss the potential for a renewed relationship, noting that its understanding was that Scientific had rejected METLabs' standard contract language and ultimately determined Scientific could not accept the liability required by the Factory Contract and that the restriction on shipping product had not been resolved

- October 15, 2018:  First 100 SmartStations were due to be delivered from Scientific

- July 3, 2019:      Scientific sues FlashParking

We take as true Scientific's statements that it did not receive a copy of the July 2018 inspection report before September 4 or 5, 2018, and that it was unaware of any inspection failures before it received FlashParking's August 28, 2018 letter. *See Provident Life & Accident Ins.*, 128 S.W.3d at 215. However, on August 8, FlashParking informed Scientific that after METLabs' surprise factory inspection, and as part of "Scientific moving assembly locations,"

18

METLabs was requiring Scientific to sign a new Factory Contract before it would "re-authorize the use [o]f the MET mark" and lift the "notice of serious non-compliance." In response, Scientific refused to sign the new Factory Contract (which was identical to the 2016 Factory Contract except for the changes to the factory address and FlashParking's name) without material amendments to the contract language that METLabs was unwilling to accept. Scientific's response when FlashParking asked whether it would sign the Factory Contract without amendments was unequivocal: Scientific "cannot sign the Factory Contract with the hold harmless and indemnify wording. There is too much potential exposure for [Scientific]." On August 10, when Scientific refused to sign the Factory Contract in the form required by METLabs, it knew it was unable to apply the MET Mark to the SmartStations and thus that it could not comply with a material term of its agreement with FlashParking—that all SmartStations be UL compliant in both components and manufacturing process. This evidence of Scientific's unequivocal refusal to sign the METLabs 2018 Factory Contract conclusively establishes that Scientific rejected its obligation to perform under the FlashParking contract to produce UL-compliant SmartStations, thus satisfying FlashParking's burden to show on summary judgment Scientific's overt communication of, and action that demonstrated, its clear and unequivocal intention not to perform.

Scientific did not present controverting evidence demonstrating any action that it took after refusing to sign the 2018 Factory Contract that would show its intent to continue its performance. There is no evidence of any inquiry from Scientific about the notice of serious non-compliance after FlashParking informed Scientific on August 8 of the notice and of the need to sign a new contract to be re-authorized to use the MET Mark. There is no evidence of any actions that Scientific took or planned to take to produce UL-compliant SmartStations. Even in Scientific's September 7 response email—with the October 15 deadline to deliver UL-compliant

19

SmartStations looming—while Scientific professed that FlashParking's August 28 termination letter was "the first [Scientific] has been told about a negative UL audit," Scientific neither represented that it would sign the 2018 Factory Contract in the form required by METLabs nor indicated that it was procuring UL-compliance certification with a different inspector. There is also no evidence in the record of any response from Scientific to FlashParking's September 11 email.

Although Scientific asserts that its September 7 email in response to FlashParking's August 28 termination letter is evidence that Scientific did not intend to repudiate the 2018 Purchase Order because Scientific indicated its surprise about the July inspection results and stated that Scientific wanted to fulfill the FlashParking contract, the September 7 email was sent 28 days after Scientific refused to sign the 2018 Factory Contract in the form required by METLabs and it still did not indicate a willingness to sign the required METLabs contract. While the UCC does allow in some circumstances for a repudiating party to retract its repudiation before its next performance is due, it cannot do so if "the aggrieved party has since the repudiation cancelled or materially changed his position or otherwise indicated that he considers the repudiation final." Tex. Bus. & Com. Code § 2.611(a). Moreover, a retraction "must include any assurance justifiably demanded under the provisions of this chapter (Section 2.609)." *Id.* § 2.611(b).

And even though Scientific also argues that its repudiation did not render its performance impossible because it could have converted its manufacturing to its original location for which the 2016 Factory Contract was executed, "[i]t is not necessary for repudiation that performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." *Id.* § 2.610 cmt. 2. In this case, Scientific did not present evidence that it suggested to FlashParking that moving its manufacturing operations back to its original facility was a possibility or that it contacted METLabs to find out

20

whether METLabs would re-authorize use of the MET Mark if Scientific moved the manufacturing back to its original facility. We conclude that FlashParking conclusively established that Scientific intentionally and unequivocally repudiated the FlashParking contract when it refused to execute the 2018 Factory Contract in the form required by METLabs for Scientific to produce UL-compliant SmartStations and that Scientific failed to raise a fact issue when the summary-judgment burden shifted to it to controvert its repudiation.

### 2. Scientific's repudiation was not the result of a mistake or misunderstanding, nor did it establish a just excuse for its repudiation

Scientific also contends that FlashParking failed to establish that METLabs actually required a new Factory Contract, and argues alternatively, even if METLabs required the new contract, Scientific's refusal to sign was based on a genuine mistake or misunderstanding about the need for the new METLabs contract, and thus it had a "just excuse" for refusing to sign. Scientific argues that the evidence raised a fact issue on the necessity of the new contract because the July 2018 inspection report only required it to submit a Project Amendment Request form to METLabs, not a new Factory Contract. It asserts that summary judgment was improper because the only evidence supporting FlashParking's contention that METLabs required a new Factory Contract came from FlashParking's August email and the interested testimony of Vinecombe and Scientific's expert, and that evidence was controverted by the July 2018 inspection report.

To the extent that Scientific is challenging whether METLabs in fact required it to sign the 2018 Factory Contract to re-authorize its use of the MET Mark, Vinecombe's "testimonial evidence is clear, positive and direct, otherwise credible and free from contradictions and inconsistencies, and could have been readily controverted." Tex. R. Civ. P. 166a(c) (allowing summary judgment to be based on such testimony). Vinecombe testified that he contacted

21

FlashParking's METLabs representative after he learned of the failed inspection and the de-authorization to use the MET Mark. The METLabs representative explained the need for new Applicant and Factory Contracts and asked him to forward the 2018 Factory Contract to Scientific to execute. Vinecombe's gathering of additional information from METLabs and learning that METLabs was requiring new Applicant and Factory Contracts is not inconsistent with the July 2018 inspection report. The fact that the July 2018 inspection report indicated that Scientific needed to submit a Project Amendment Request form with its new facility's address and the FlashParking name does not reasonably exclude the possibility that METLabs would also require new contracts. The terms of the 2016 Factory Contract gave METLabs the authority to require Scientific to "immediately terminate its application of the MET Mark to any product(s) stipulated at any time by MET to be ineligible" and to terminate the Factory Contract "at MET's discretion" if Scientific violated the Contract requirements and failed "to cure any such violation within 10 business days." The Factory Contract places no limitations on what actions METLabs could require Scientific to take to cure violations. Furthermore, if METLabs did not in fact require a new Factory Contract, Scientific could have obtained that information through discovery from METLabs, but no such evidence is part of the summary-judgment record. We conclude that the summary-judgment evidence conclusively establishes that METLabs required Scientific to sign a new Factory Contract after it de-authorized the parties from using the MET Mark to certify the UL compliance of the SmartStations and that Scientific did not raise a fact issue to the contrary when the summary-judgment burden shifted to it.

Scientific further contends that even if METLabs required Scientific to sign the new Factory Contract to restore its ability to produce certified UL-compliant SmartStations, Basta's testimony raises a fact issue on whether Scientific's refusal to sign the new Factory Contract

22

resulted from a mistake or misunderstanding about the necessity for a new contract, or in other words, whether there was just excuse for Scientific's refusal to sign. *See Englehart v. Volunteer State Life Ins. Co.*, 195 S.W.2d 798, 802 (Tex. App.—Eastland 1946, writ ref'd n.r.e.) (holding that trial court properly concluded that defendant insurance company's failure to make policy payments was based on good-faith belief that insured plaintiff was no longer disabled and thus was not anticipatory breach because it was based on misunderstanding as to matters of fact). In response, FlashParking asserts that because this case is governed by the UCC, it is not required to establish that Scientific lacked just excuse for its repudiation, but as noted above, we need not decide what effect the UCC has, because here the summary-judgment evidence conclusively establishes that Scientific's repudiation was not based on a mistake or misunderstanding and that it lacked just excuse.

In his affidavit, Basta attested that he "was surprised and confused after the receipt of the August 28 letter. Although I did not understand the need for a 2018 Factory Contract in light of the 2016 Factory Contract, I did in fact sign a 2018 version in good faith." He further averred: "I never intended to repudiate the contracts on behalf of Scientific and Scientific was ready, willing and able to cooperate with any necessary inspection issues to resolve UL compliance. In light of the fact that the 2016 Factory Contract was in force and Metlabs had just recently completed the July 25, 2018 audit, I did not understand the need to sign a 2nd Factory Contract."

Scientific's correspondence with FlashParking at the time Scientific refused to sign the new Factory Contract without Scientific's requested modifications controverts this interested-witness testimony and conclusively establishes that Scientific's refusal to sign was not based on a good-faith misunderstanding. *See* Tex. R. Civ. P. 166a(c). FlashParking informed

Scientific on August 8 that after the July 2018 inspection, because of Scientific's move of the SmartStation assembly process to its new facility, METLabs was requiring the new Factory Contract to be signed before it would re-authorize the use of the MET Mark to certify the SmartStations as UL compliant. Neither Basta nor McCain expressed confusion then over why Scientific needed to sign a second Factory Contract. Instead, Scientific refused to sign the new Factory Contract unless it could strike the provision allowing METLabs to conduct unannounced factory inspections and the hold-harmless provision requiring it to indemnify METLabs if Scientific used MET's certification mark in an unauthorized manner—even though the same terms were contained in the 2016 Factory Contract under which it claimed it was still performing. After FlashParking informed Scientific that METLabs would not accept amendments to the Factory Contract, and later, that FlashParking was terminating their relationship because of Scientific's repudiation of the material requirement of UL compliance, Basta continued to profess that Scientific's execution of the amended Factory Contract should be sufficient and raised no question about whether or why a new contract was needed. Scientific's obstreperous insistence on changing METLabs' standard contract language, which the parties had operated under for the past two years, especially coming after Scientific failed an unannounced inspection, belies Basta's purported confusion. Therefore, we conclude that the parties' contemporaneous correspondence conclusively establishes that Scientific did not refuse in good faith to sign the 2018 Factory Contract because of a misunderstanding about whether METLabs was requiring the new Factory Contract, why METLabs was requiring it, or the consequence of failing to sign it, and we further conclude that Scientific failed to produce controverting proof that raises a fact issue on its lack of just excuse.

**3. FlashParking established that Scientific's repudiation substantially impaired the value of the contract to FlashParking, which is all that the UCC requires**

Scientific asserts that the trial court erred by granting summary judgment because FlashParking failed to allege or prove it was damaged by Scientific's repudiation. We disagree. The UCC does not require the nonrepudiating party to allege or prove damages. Instead, it requires only that the loss of the repudiating party's performance "will substantially impair the value of the contract to the other party" to enable the aggrieved party to suspend its own performance and either await performance for a commercially reasonable time or resort to its remedies for breach. Tex. Bus. & Com. Code § 2.610. FlashParking conclusively established through testimony from Vinecombe and its expert that the SmartStations were unmarketable if they were not UL compliant and thus that Scientific's repudiation would substantially impair the value of the contract.

Scientific further argues that the summary-judgment evidence established that FlashParking was not damaged because it had found an alternate source to assemble the SmartStations at the time it sent the August 28 letter to Scientific terminating the parties' agreement. We disagree that this evidence raises a fact issue as to whether FlashParking was damaged by Scientific's repudiation. UCC Section 2.610 provides that the aggrieved party may proceed with the remedies available to it at any time after repudiation occurs. *See id.* § 2.610 & cmt. 4. FlashParking's exercise of its available remedies after repudiation does not negate the fact that Scientific's refusal to maintain its certification to produce UL-compliant SmartStations would substantially impair the value of the contract. We conclude that FlashParking conclusively established that the repudiation substantially impaired the value of the parties' contract, which is all that the UCC requires it to do, and that Scientific did not raise a fact issue to the contrary.

25

### 4. FlashParking's dissatisfaction with the 2018 Purchase Order's terms does not create a fact issue on whether Scientific repudiated

Scientific also argues that FlashParking's ability to shift the assembly of SmartStations to a different source establishes that FlashParking was preparing to breach the parties' contract and that FlashParking used Scientific's refusal to sign the METLabs 2018 Factory Contract as a pretext to get out of the 2018 Purchase Order. Scientific contends that FlashParking's finding a new source for assembly, as well as the difference in tone between what it characterizes as the "apologetic tone" of FlashParking's August 8 email and the August 24 termination letter asserting that Scientific's refusal to sign the METLabs 2018 Factory Contract was a repudiation, at a minimum create a fact issue on whether Scientific repudiated or FlashParking seized an opportunity to breach without consequences. Viewing the evidence in the light most favorable to Scientific, FlashParking admittedly considered the 2018 Purchase Order unfair, and Vinecombe acknowledged that FlashParking began to reconsider its heavy reliance on Scientific for SmartStation assembly after Scientific withheld its inventory before the parties agreed on the terms of the 2018 Purchase Order. Nevertheless, the summary-judgment evidence conclusively establishes that Scientific knew when it refused to sign the 2018 Factory Contract in the form required by METLabs that it would no longer be authorized to deliver UL-compliant SmartStations as required by the 2018 Purchase Order. Scientific's decision to refuse was not controlled by FlashParking. Once Scientific made the decision to repudiate, FlashParking was entitled to exercise its remedies under the UCC. FlashParking's decision to exercise its available remedies does not somehow negate Scientific's repudiation.

To summarize, the summary-judgment evidence, viewed in the light most favorable to Scientific, establishes as a matter of law that (1) the requirement that the SmartStations be UL

26

compliant was a material term of the parties' express contract; (2) the SmartStations are unmarketable if they are not certified UL compliant; (3) the certification from METLabs enabled Scientific to produce UL-compliant SmartStations; (4) after the July 2018 inspection, METLabs had required Scientific to terminate its application of the MET Mark on SmartStations based on Scientific's non-compliance with the 2016 Factory Contract; (5) METLabs was requiring Scientific to execute the 2018 Factory Contract as a precondition to reauthorizing Scientific to use the MET Mark; (6) Scientific refused to sign the 2018 Factory Contract without modifications knowing that METLabs would not reauthorize it to use the MET Mark without a new contract; and (7) Scientific offered no assurances to FlashParking that it would re-establish and maintain its certification to produce UL-compliant SmartStations. Under the facts presented in this case, Scientific's refusal to sign the 2018 Factory Contract in the form required by METLabs constitutes "a rejection of [its] continuing obligation" under its contract with FlashParking. *Id.* § 2.610 cmt. 2. Therefore, on this record, we conclude that FlashParking conclusively established its affirmative defense of repudiation and Scientific failed to raise a material fact issue precluding summary judgment against its breach-of-contract claim.

## II.     Scientific's other issues challenging summary judgment

Having concluded that summary judgment was proper on the ground of repudiation, we need not consider Scientific's other two sub-issues challenging summary judgment. *See* Tex. R. App. P. 47.1. Scientific asserted its quantum meruit claim in the alternative to its breach-of-contract claim, seeking compensation for "valuable services which [FlashParking] accepted."[9]

---

[9]     Even though Scientific alleges there is a valid contract, it argues that because FlashParking raised duress as an affirmative defense, and because that defense would invalidate

"Quantum meruit is an equitable remedy 'based upon the promise implied by law to pay for beneficial services rendered and knowingly accepted.'" *In re Kellogg Brown & Root, Inc.*, 166 S.W.3d 732, 740 (Tex. 2005) (orig. proceeding) (quoting *Vortt Exploration Co., Inc. v. Chevron U.S.A., Inc.*, 787 S.W.2d 942, 944 (Tex.1990)). The common-law doctrine's purpose is to prevent unjust enrichment by a party who retains the benefits of the performance without payment in return. *Hill v. Shamoun & Norman, LLP*, 544 S.W.3d 724, 732 (Tex. 2018). A party generally cannot recover in quantum meruit when there is a valid express contract covering the services or materials furnished. *Truly v. Austin*, 744 S.W.2d 934, 936 (Tex. 1988) (explaining that plaintiff who breached contract could not recover in quantum meruit for his partial performance). Thus, because we have concluded that there was a valid express contract that Scientific anticipatorily breached, meaning that the trial court properly granted summary judgment on FlashParking's affirmative defense to Scientific's breach-of-contract claim, we need not also consider whether the trial court erred by granting summary judgment on Scientific's alternative claim for quantum meruit. *See Provident Life & Accident Ins.*, 128 S.W.3d at 216 (requiring appellate courts to uphold summary judgment on any ground asserted in motion and preserved for appellate review when trial court does not specify grounds for granting summary-judgment motion). Similarly, we need not reach Scientific's other sub-issue contending that it rebutted FlashParking's no-evidence motion by providing sufficient evidence of the damages element of its breach-of-contract claim. *See id.*; *see also* Tex. R. App. P. 47.1.

---

the parties' contract if FlashParking prevailed on it at trial, FlashParking failed to prove as a matter of law that Scientific could not prevail on its quantum meruit claim.

**III.    Scientific's challenge to the trial court's evidentiary ruling**

In its second issue, Scientific contends that the trial court abused its discretion by striking certain affidavit testimony about the additional $99,000 payment that was part of the 2018 Purchase Order. This affidavit testimony has no bearing on the resolution of FlashParking's affirmative defense of repudiation. Accordingly, we need not reach this issue because we have concluded that the trial court properly granted summary judgment based on that affirmative defense. *See* Tex. R. App. P. 47.1.

**CONCLUSION**

Having concluded that FlashParking established its affirmative defense of repudiation as a matter of law, we affirm the trial court's take-nothing summary judgment against Scientific.

_____

Gisela D. Triana, Justice

Before Justices Goodwin, Triana, and Kelly
  Dissenting Opinion by Justice Goodwin

Affirmed

Filed:   November 12, 2021

29